**ORANGE PARK FLORIDA T.V., INC., Appellant,**

v.

**FEDERAL COMMUNICATIONS COMMISSION, Appellee,**

Clay Television, Inc., Intervenor.

No. 85–1816.

United States Court of Appeals, District of Columbia Circuit.

Argued Nov. 17, 1986.

Decided Feb. 13, 1987.

As Amended Feb. 13, 1987.

John R. Feore, Jr., with whom Alan C. Campbell, Washington, D.C., was on brief, for appellant. Christopher C. Smallwood,

Washington, D.C., entered an appearance for appellant.

Jane E. Mago, Counsel, Federal Communications Commission, Washington, D.C., for respondent. Jack D. Smith, Gen. Counsel, Daniel M. Armstrong, Associate Gen. Counsel and Gregory M. Christopher, Counsel, Federal Communications Commission, Washington, D.C., were on brief, for respondent.

Thomas L. Root, Washington, D.C., was on brief, for intervenor.

Before STARR and BUCKLEY, Circuit Judges, and ROBINSON,* Chief Judge.

Opinion for the Court filed by Circuit Judge STARR.

STARR, Circuit Judge:

Orange Park Florida T.V., Inc. appeals a decision by the Federal Communications Commission denying its application for a construction permit to construct a UHF television station and granting the competing application of the intervenor, Clay Television, Inc. Orange Park challenges the denial of its application as arbitrary and capricious and the award to Clay as contradictory of Commission regulations. We

conclude that the Commission reasonably found Orange Park unqualified for comparative consideration and therefore affirm that portion of the FCC's decision. We also hold, however, that the FCC erred in the course of granting Clay's application and therefore remand that matter to the Commission.

**I**

The chain of events leading to this appeal began in November 1980, when Clay Television filed an application with the FCC to construct a television station to broadcast over UHF channel 25 in Orange Park, Florida. *See* 47 U.S.C. §§ 308, 309 (1982 & Supp. III 1985).[1] Orange Park filed a competing application for channel 25 shortly thereafter. After a hearing, an administrative law judge determined that neither application satisfied the Commission's threshold requirements and therefore made no award.[2]

The ALJ found Orange Park "basically unqualified" under 47 C.F.R. § 73.610(c)(1) (1983).[3] That provision sets forth minimum spacing requirements for TV broadcast antennas, and specifically requires UHF television antennas to be 55 miles apart.[4] Or-

---

* Of the United States District Court for the District of Columbia, sitting by designation pursuant to 28 U.S.C. § 292(a).

1. As we explained in an earlier decision, "[a] construction permit is a prerequisite to the issuance of a new station license and 'except in rare [instances], it is also a guarantee of a license to operate the station once constructed.'" *Bamford v. FCC,* 535 F.2d 78, 79 n. 2 (D.C.Cir.) (quoting *Fidelity Television, Inc. v. FCC,* 515 F.2d 684, 688 n. 2 (D.C.Cir.), *cert. denied,* 423 U.S. 926, 96 S.Ct. 271, 46 L.Ed.2d 253 (1975)), *cert. denied,* 429 U.S. 895, 97 S.Ct. 255, 50 L.Ed.2d 178 (1976).

2. *Clay Television, Inc.,* 95 F.C.C.2d 1187 (1982) (initial decision of administrative law judge), Joint Appendix ("J.A.") at 1.

3. 47 C.F.R. § 73.610(a) (1983) provides in pertinent part:

   [A]ll applications for new television broadcast stations ... will not be accepted for filing if they fail to comply with the requirements specified in paragraph[ ] ... (c) ... of this section.

Paragraph (c) of § 73.610 then provides in relevant part:

   (c) Minimum assignment and station adjacent channel separations applicable to all zones.

   (1) ... channels 14–69 55 miles.

4. The Commission promulgated minimum separation requirements for television broadcast antennas as part of its comprehensive system of allocating television channels so as to provide each broadcaster with some degree of protection from interference. *See* 47 C.F.R. § 73.606 (1983) (table of channel assignments). *See generally Amendment of Section 3.606 of the Commission's Rules & Regulations,* 41 F.C.C. 148 (Comm'n 1952). The Commission adopted this comprehensive approach after assessing the drawbacks of the earlier "on demand" system employed in allocating AM radio stations, under which each application required the Commission to perform complex individualized calculations of signal interference. *See id.* at 151–53; *see also North Texas Media, Inc. v. FCC,* 778 F.2d 28, 30–31 (D.C.Cir.1985). In contrast to the "on demand" system, the minimum separation system operates on the assumption that all stations

ange Park ran afoul of the 55–mile rule by proposing an antenna site 52.36 miles from that already proposed in an application for a different channel. Thus, in the parlance of broadcast regulation, Orange Park's proposed site was "short-spaced" by 2.64 miles.

The ALJ went on to deny Orange Park's request for a waiver of the minimum spacing requirements. Orange Park's primary argument in this ·respect was that broadcasting from a short-spaced site with the proposed 1,000–foot antenna and contemplated signal strength would create no more interference than would be occasioned by broadcasting from a fully-spaced site with a maximum height antenna and a maximum-strength signal permitted under the Commission's regulations. The ALJ rejected this "equivalent protection" rationale, holding that that notion, under settled Commission precedent, was inapplicable to UHF broadcasting. *Initial Decision, supra,* note 2, 95 F.C.C.2d at 1198, J.A. at 12. As an independent reason, the ALJ found that Orange Park had failed to demonstrate that no fully-spaced sites were available, a showing that waiver applicants had to satisfy as a threshold matter. *Id.* The Commission's Review Board and the full

Commission did not disturb this aspect of the ALJ's decision.[5]

Clay's application for a construction permit fared no better than Orange Park's in the ALJ's initial decision, for Clay was found in violation of another Commission regulation, 47 C.F.R. § 73.3572(b) (1983). That rule removes an application from consideration when it is amended to effect a major transfer of ownership from the ownership structure proposed in the original application.[6] Of especial significance in this case, Clay had carried out a 50% ownership change in two filings.[7] The first shift, amending Clay's application to reflect a 26% change in ownership, occurred on the so-called "A cut-off" date. That is the final date for filing applications for a channel. *See* 47 C.F.R. § 73.3572(c) (1983); *see also Revised Procedures for the Process-· ing of Contested Broadcast Applications,* 72 F.C.C.2d 202, 207–08, 210–11 (1979). Clay's second filing changed the originally proposed ownership structure by an additional 24% and took place on the "B cut-off" date. The latter date is the last day for those opposing any application to file a petition to deny. *See* 47 C.F.R. § 73.3584 (1983).

erect antennas at the maximum height permitted under the Commission's rules and broadcast signals at the maximum strength. *See* 47 C.F.R. § 73.612(a) (1983); *see also North Texas Media,* 778 F.2d at 30 (discussing analogous system for allocating FM radio stations). Thus, the Commission's minimum spacing rules are designed to protect stations from theoretical, as opposed to actual, interference.

5. *Clay Television, Inc.,* 95 F.C.C.2d 1167 (Rev.Bd. 1983), J.A. at 27, *reconsid. denied,* 98 F.C.C.2d 510 (1984), J.A. at 35; *Clay Television,* FCC No. 82M–3203 (Commission Memorandum & Order dated Oct. 15, 1982), J.A. at 147.

6. 47 C.F.R. § 73.3572(b) provides in pertinent part:

A new file number will be assigned to an application for a new station ... when it is amended so as to ... result in an assignment or transfer of control (whether by a single amendment or by a series of amendments), which in the case of an authorized station, would require the filing of an FCC Form 314, 315 or 345....

All parties agree that if Clay were the licensee of an existing station, i.e., "an authorized station" within the meaning of section 73.3572(b), an FCC Form 315 would be required to accomplish a 50% ownership transfer. *See* Brief of Appellee at 21; Brief of Intervenor at 2; Brief of Appellant at 23 n. 55; *see also* 47 C.F.R. § 73.3540(a), (d) (1983); *Clay Broadcasters, Inc.,* 21 Rad.Reg.2d (P & F) 442, 446 (Comm'n 1971). The effect of assigning a new file number is removal from competitive consideration with other filed applications. *See* 47 C.F.R. § 1.227(b)(1) (1984).

7. *See Initial Decision, supra* note 2, 95 F.C.C.2d at 1191–92, 1194–95, J.A. at 5–6, 8–9. The amendments transferred stock from male shareholders who would not participate in managing the proposed station to the spouses of those stockholders, who would take part in station management. The transfers were apparently intended to enhance Clay's application in the eyes of the Commission, which favors proposals that involve female station owners in day-to-day operations. *See Clay Television, Inc.,* 95 F.C.C.2d 1175, 1185–86 (1982) (supplemental decision of ALJ), J.A. at 15, 25–26.

Clay did not dispute that its two amendments, if considered together, effected a major change in ownership under the Commission's rules. Instead, it argued before the ALJ that for purposes of the ownership-change provision only amendments filed *after* the A cut-off should be counted. To buttress its interpretation, Clay pointed out that it could have withdrawn its original application and filed a new one altogether prior to the A cut-off date without being removed from consideration; therefore, Clay reasoned, a mere amendment of the original application before that date should not be the basis for dismissing an otherwise proper application. The ALJ nonetheless rejected Clay's interpretation, concluding that the plain language of the regulation and longstanding Commission precedent required considering *all* amendments affecting ownership, whenever filed. *Initial Decision, supra* note 2, 95 F.C.C.2d at 1199, J.A. at 13.

Unlike Orange Park, however, Clay enjoyed success in seeking review of the ALJ's determination. In interlocutory review of the ALJ's ruling on the ownership transfer issue, the full Commission concurred with the ALJ's determination that both the language of section 73.3572 and Commission precedent brought Clay within the strictures of that rule and would normally necessitate dismissal of its application.[8] The Commission determined, however, that under the circumstances presented, Clay should be permitted to cure its violation rather than suffer the Draconian sanction of dismissal. The basis for its decision was that the FCC staff responsible for processing construction permit applications (then known as the "Broadcast Bureau," now as the "Mass Media Bureau") had, since the use of A and B cut-off dates was adopted in 1979, interpreted section 73.3572 as had Clay, namely to require

consideration only of ownership amendments filed after the A cut-off date.[9] In light of the confusion sown by the staff's interpretive practices, the Commission concluded that the rule should not be applied to Clay under the circumstances of this case.[10] Accordingly, the FCC remanded the case to the ALJ, who subsequently found Clay otherwise qualified and, as the sole surviving applicant, entitled to the construction permit.[11]

After exhausting its administrative remedies, Orange Park brought this appeal pursuant to 47 U.S.C. § 402(b)(1), (6). Clay has intervened.

## II

On appeal, Orange Park mounts a two-pronged attack on the Commission's decision. First, it challenges the FCC's denial of its request for a waiver of the Commission's minimum spacing rules as an arbitrary and capricious departure from precedent. *See* 5 U.S.C. § 706(2)(A) (1982); *see also Motor Vehicle Manufacturers Association v. State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29, 50, 103 S.Ct. 2856, 2870, 77 L.Ed.2d 443 (1983); *Airmark Corp. v. FAA*, 758 F.2d 685, 692 (D.C.Cir.1985). Second, Orange Park attacks the Commission's decision allowing Clay to cure its violation of the ownership-change provision as violative of that rule and, accordingly, as offensive to the fundamental principle that an agency is bound by its rules. *See Reuters Limited v. FCC*, 781 F.2d 946 (D.C.Cir.1986). Clay, of course, supports the Commission's orders in all respects. In addition, it argues that were we to decide that Orange Park was properly disqualified because of its failure to comply with the minimum spacing rules, then we are obliged to conclude that Or-

---

8. *Clay Television, Inc.,* FCC No. 82–417 (Commission Memorandum & Order dated Sept. 21, 1982), J.A. at 142.

9. In rendering its initial decision, the ALJ apparently did not have the benefit of information about the conflicting practices of the FCC staff. Clay first raised this issue in seeking interlocutory review of the ALJ's initial determination

that its application should be dismissed for running afoul of § 73.3572. *See id.* at 2, J.A. at 143.

10. *Id.* at 4, J.A. at 145.

11. *Clay Television, Inc.,* 95 F.C.C.2d 1175 (1982) (supplemental decision of ALJ), J.A. at 15.

ange Park lacks standing to contest the award to Clay.

## A

■ Orange Park's objections to the Commission's determination that it was unqualified to obtain a construction permit need not long detain us. Its violation of the minimum spacing rules is clear and undisputed. That being so, Orange Park's only hope lay in the possibility of a Commission-granted waiver from its rules. But it is elementary that the judiciary may disturb a Commission refusal to waive its rules only in the event of an abuse of discretion. *See North Texas Media, Inc. v. FCC,* 778 F.2d 28, 32 (D.C.Cir.1985); *City of Angels Broadcasting, Inc. v. FCC,* 745 F.2d 656, 665 (D.C.Cir.1984); *see also Basic Media, Ltd. v. FCC,* 559 F.2d 830, 833–34 (D.C.Cir.1977) (applicant for waiver of agency's rule carries a heavy burden). Measured under that generous standard, the Commission's decision in this instance easily withstands attack.

■ In essence, Orange Park argues that in two respects the FCC departed without justification from prior precedent addressing the showing necessary to obtain a waiver: *first,* by requiring it to prove as a threshold matter that no fully-spaced sites were available; and *second,* by rejecting the "equivalent protection" rationale upon which Orange Park relied to prove that its operations from a short-spaced site would not cause significant interference.

Commission precedent makes clear that an applicant seeking waiver of the minimum spacing rules must, as an initial matter, establish the nonavailability of fully-spaced sites. *See Townsend Broadcasting Corp.,* 62 F.C.C.2d 511, 512 (Comm'n 1976). This court has expressly recognized and upheld the reasonableness of this threshold requirement. *See North Texas Media,* 778 F.2d at 32. Thus, the ALJ need not even have considered Orange Park's assertion that its signal from a short-spaced site would produce only insignificant interference; Orange Park's waiver request died, as it were, at the starting gate.[12]

Nonetheless, if we assume *arguendo,* as did the ALJ, that Orange Park's request left the gate, we find reasonable and consistent with Commission precedent the determination that it was hobbled at the first turn. As already mentioned, Orange Park set forth no evidence of how much interference its station would cause, choosing instead to rely solely on the "equivalent protection" rationale. It did so in the face of unequivocal Commission precedent that the Commission considered "equivalent protection" analysis inapplicable to UHF broadcasting because of the unique nature of UHF signal propagation. *See Pappas Telecasting, Inc.,* 49 Rad.Reg.2d (P & F) 1688, 1690 (Comm'n 1981); *Carolina Christian Broadcasting, Inc.,* 48 Rad. Reg.2d (P & F) 355, 358 (Broadcast Bur. 1980); *see also Carolina Broadcasting Co.,* 16 Rad.Reg.2d (P & F) 801, 803–04 (Comm'n 1969). We find it unnecessary to

---

12. On appeal of the ALJ's decision to the Commission's Review Board, Orange Park maintained, as it had before the ALJ, that it satisfied this threshold requirement by showing that because of their proximity to an airport, none of the available fully-spaced sites could accommodate the 1,000–foot antenna it proposed to erect. *See Decision of Review Board, supra* note 5, 95 F.C.C.2d at 1171, J.A. at 31; Orange Park Hearing Exhibit 8, J.A. at 88; Hearing Transcript at 390, 414–15, 423–24, 448–51, J.A. at 131–39. As support for its view that availability of fully-spaced sites must be determined by reference to the specific operations proposed by the applicant seeking the waiver, Orange Park cites *WSET, Inc.,* 80 F.C.C.2d 233 (1980), in which the Commission granted a waiver of Section 73.610 based on proof that although fully-spaced sites

existed, none would accommodate the service proposed by the licensee that sought the waiver. *WSET,* however, concerned a request by an *existing* licensee that wished to move its transmitter from an existing short-spaced site to a site that was less short-spaced. The Review Board determined that the particular circumstances surrounding the waiver request in *WSET* sufficiently distinguished that decision to render it inapplicable to Orange Park's waiver request. 95 F.C.C.2d at 1171–72, J.A. at 31–32.

We accept the Commission's explanation that *WSET* does not apply. This court has previously recognized and upheld as reasonable the Commission's practice of holding new applicants to stricter standards for obtaining a waiver than it does existing licensees. *See North Texas Media,* 778 F.2d at 32.

judge the propriety of the FCC's determination that "equivalent protection" does not apply to UHF broadcasting, since Orange Park does not in fact dispute this judgment, but instead complains that the Commission provided insufficient guidance on how it could demonstrate that its proposed operations would not cause significant interference. We conclude that Orange Park's belated objection is unavailing, for it sought no guidance from the Commission on this issue,[13] and nonetheless relied exclusively on the "equivalent protection" rationale in the face of clear precedent that its approach was doomed to fail.

In sum, the FCC's denial of Orange Park's waiver request was fully consistent with agency precedent. Since Orange Park has not shown, or indeed even attempted to demonstrate, that this precedent is unreasonable or contrary to law, we affirm the Commission's decision in this respect.

## B

■ Having upheld the Commission's decision to disqualify Orange Park, we must next address Clay's and the Commission's contention that Orange Park lacks standing to appeal the award to Clay. Their argument is that Orange Park was ineligible for the construction permit in any case and so was not injured by the award to Clay. Since in their view Orange Park suffered no injury because of the award, it satisfied neither the statutory requirement that parties appealing Commission decisions be "aggrieved" or "adversely affected" by such decisions [14] nor the constitutional requirement of standing that a litigant plead "injury in fact" fairly traceable to the conduct complained of and likely to be redressed by the requested relief.[15]

### 1

For the statutory leg of their argument, Clay and the FCC rely primarily, and belatedly, on this court's decision a generation ago in *Simmons v. FCC*, 145 F.2d 578 (D.C.Cir.1944).[16] In that case, the court reviewed a Commission order denying Sim-

---

**13.** From those portions of the hearing transcript supplied in the parties' submissions, it appears that Orange Park's engineering expert formulated his "equivalent protection" rationale with scant attention to Commission regulation. *See* Hearing Transcript at 266–69, J.A. at 104–07. It further appears that the expert decided to rely exclusively on the rationale because none of the FCC staff raised any questions about Orange Park's submission—concerning, for example, estimates of the geographic area and number of persons affected by interference from Orange Park's proposed operations. *See id.* at 292, J.A. at 111. Finally, Orange Park never supplied such information even after the ALJ clearly expressed dissatisfaction with the lack of additional data and doubt as to the validity of "equivalent protection" reasoning, *id.* at 292–93, J.A. at 111–12, even though Orange Park could have submitted additional information on interference when it sought to have the Commission order the ALJ to revisit the short-spacing issue. *Clay Television, Inc.,* FCC No. 82M–3203, at 1 n. 1 (Commission Memorandum & Order dated Oct. 15, 1982), J.A. at 147 n. 1. Considering this approach to meeting its burden of justifying a waiver before the agency, we are persuaded it ill behooves Orange Park to contend that the Commission improperly left it in the dark.

**14.** 47 U.S.C. § 402(b), the statute pursuant to which Orange Park appeals, provides in pertinent part:

(b) Appeals may be taken from decisions and orders of the Commission to the United States Court of Appeals for the District of Columbia in any of the following cases:

(1) By any applicant for a construction permit or station license, whose application is denied by the Commission.

. . . . .

(6) By any other person who is aggrieved or whose interests are adversely affected by any order of the Commission granting or denying any application described in paragraphs (1)–(4) of this subsection.

**15.** *See, e.g., Allen v. Wright,* 468 U.S. 737, 751, 104 S.Ct. 3315, 3325, 82 L.Ed.2d 556 (1984); *Valley Forge Christian College v. Americans United for Separation of Church & State, Inc.,* 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982).

**16.** In their original submissions to this court, none of the parties saw fit to address the question of Orange Park's standing, aside from a passing reference, unsupported by legal authority, in a footnote to the FCC's brief. *See* Brief of Appellee at 31 n. 19. At oral argument, this court drew attention to the decisions of this circuit relevant to the issue and ordered further briefing. In their post-argument reflections, Clay and the Commission more fervently maintained that Orange Park did indeed lack stand-

mons' application for a construction permit to rebuild a radio station and granting a competing application. 145 F.2d at 578–79. The court affirmed the denial of Simmons's application, concluding that it was supported by substantial evidence that the applicant's operations would obstruct air navigation. *Id.* at 579. Based on this conclusion, the court held that Simmons lacked standing to challenge the Commission's grant to a competing applicant. The court's reasoning is set out in full:

> Since appellant's application was rightly denied he has no ground for complaint. He does not contend that he is worse off than he would have been if intervenor's application, as well as his own, had been denied. Accordingly, he is not "aggrieved" or "adversely affected" by the granting of intervenor's application and has no standing to appeal from it.

*Id.* at 579 (footnote omitted).

Despite the brevity of this explanation, we are persuaded, upon reflection, that *Simmons* does not apply to the present case. In contrast to *Simmons*, Orange Park vigorously asserts that it is worse off by virtue of the Commission's award to Clay. Had the Commission dismissed Clay's application, Orange Park points out, channel 25 would have remained available and Orange Park could have filed a new (and presumably conforming) application. In further contrast to *Simmons*, where it was uncertain whether the disqualified candidate was able to cure the defect in its application (or was willing to do so), here Orange Park specifically alleges that dismissing Clay's application would have made it easier for Orange Park to amend its application to specify a fully-spaced site;[17] that fully-spaced sites were available; and that Orange Park was willing to make such an amendment had Clay's application been dismissed. Supplemental Brief of Appellant at 6. It would thus appear

that an improper award of the construction permit to Clay constituted more than harmless error as to Orange Park.

At the same time, we cannot fail to recognize that, aside from the facts that Simmons did not allege that he was worse off by virtue of the FCC's allegedly erroneous award to the competing applicant and that, if given the opportunity he could and would reapply for the permit, there is substantial similarity between the facts of *Simmons* and those of this case. In particular, the disqualifying features of Simmons' application were, it appears, readily curable through amendments; thus, it would appear that Simmons, like Orange Park, was deprived by award to a competitor of the opportunity to cure the remediable defect in his initial application. *Cf. Teleprompter*, 543 F.2d at 1384–87 (agency has discretion to decide that disqualification on grounds of corruption or bribery may not be immediately cured).

Nonetheless, while the factual setting of *Simmons* bears a resemblance to that of the present case, we also cannot fail to observe that the doctrine of standing prevailing at that time has changed significantly in the intervening decades. Of particular importance is the abandonment of the "legal right" requirement that governed when *Simmons* was decided. Under that requirement, to establish standing a litigant had to demonstrate that the defendant's conduct infringed a legal right enjoyed by the litigant. Thus, in a situation analogous to the one before us, the Supreme Court held that a disappointed bidder for a government contract lacked standing to contest the award to a successful bidder, because the procurement laws under which such contracts were made conferred no legal rights on bidders; they were intended solely to protect the Government. *See Perkins v. Lukens Steel Co.*,

ing under this court's precedents, especially *Simmons.*

**17.** Specifically, Orange Park cites Commission precedent holding that amendments by applicants filed after a comparative hearing has been designated will only be permitted if the appli-

cant seeking to amend shows that competing applicants would not be disadvantaged by the amendment. *See* Supplemental Brief of Appellant at 6 n. 3 (citing *Erwin O'Connor Broadcasting Co.*, 22 F.C.C.2d 140, 143 (1973)).

310 U.S. 113, 127–32, 60 S.Ct. 869, 876–79, 84 L.Ed. 1108 (1940). More recently, however, the Court jettisoned the "legal right" requirement. *See Association of Data Processing Organizations, Inc. v. Camp,* 397 U.S. 150, 153, 90 S.Ct. 827, 830, 25 L.Ed.2d 184 (1970). And this court has, of course, long recognized that disappointed bidders have standing to challenge government awards. *See, e.g., Scanwell Laboratories, Inc. v. Shaffer,* 424 F.2d 859 (D.C. Cir.1970). The basis for this recognition is that a wrongful award of a government contract constitutes a discrete economic injury to unsuccessful bidders, who therefore have an incentive to vindicate the public interest as well as their own by insisting on the integrity of the procurement process. *See id.* at 864; *see also CACI, Inc.—Federal v. United States,* 719 F.2d 1567, 1572–75 (Fed.Cir.1983). We believe, on reflection, that these principles point strongly in the direction of granting standing to Orange Park to challenge the award to Clay.

The Commission does not dispute that by awarding a construction permit to Clay instead of dismissing Clay's application, the Commission deprived Orange Park of a second chance to apply for channel 25. Nor does it take issue with Orange Park's assertion that it readily could have cured the disqualifying feature in its original application by specifying a fully-spaced site. Instead, the Commission characterizes Orange Park's injury as its failure to secure a permit in the proceedings below. This injury, the Commission's argument runs, was solely Orange Park's fault; it cannot be traced to the FCC's award to Clay. While the Commission's argument is correct as far as it goes, it does not meet the assertion of an injury that is separate and distinct from Orange Park's initial failure to secure a permit, namely, the opportunity to try again were Clay to lose. *Cf. Delta Data Systems Corp. v. Webster,* 744 F.2d 197, 206 (D.C.Cir.1984) (granting relief to disappointed bidder for government contract who, through agency error, was de-

prived of *"opportunity* to obtain an award") (emphasis in original).

**2**

Moving beyond *Simmons* itself, we turn to the bedrock constitutional requirements arising under Article III. In our view, Orange Park's allegations clearly satisfy the requirement that a litigant plead injury in fact fairly traceable to the defendant's allegedly illegal conduct and likely to be redressed by the relief requested. *See, e.g., Allen v. Wright,* 468 U.S. 737, 751, 104 S.Ct. 3315, 3325, 82 L.Ed.2d 556 (1984); *Valley Forge Christian College v. Americans United for Separation of Church & State,* 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982); *American Legal Foundation v. FCC,* 808 F.2d 84, 88 (D.C. Cir.1987). First, the Commission's deprivation of Orange Park's opportunity to reapply for channel 25 clearly constitutes a cognizable economic injury. Without belaboring the obvious, suffice it to say that Orange Park spent time and money formulating a specific proposal for broadcast operations, which the award to Clay rendered for naught. *See Village of Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252, 262, 97 S.Ct. 555, 561, 50 L.Ed.2d 450 (1977). Second, Orange Park's injury resulted directly from the FCC's award to Clay. But for that award, it would still be open season for Orange Park in the effort to secure rights to channel 25. Such a direct causal link between the FCC's conduct and Orange Park's injury amply meets the "traceability" requirement of standing. *See Von Aulock v. Smith,* 720 F.2d 176, 181 (D.C.Cir. 1983). Finally, vacating the award to Clay will redress Orange Park's injury by affording it the opportunity to reapply for the construction permit, which Orange Park has indicated it stands ready, willing and able to do. *See Village of Arlington Heights,* 429 U.S. at 261–62, 97 S.Ct. at 561; *see also Von Aulock,* 720 F.2d at 180.[18]

---

**18.** Although Orange Park has not said in so many words that it would reapply for channel 25, this intention is manifestly evident from

Orange Park's litigating this issue and its allegation that it considers itself aggrieved by the loss of the "opportunity to amend to cure its short-

**3**

We are likewise convinced that Orange Park's allegations satisfy statutory and prudential standing requirements. Section 402(b)(6) of title 47 in relevant part extends standing to any person "who is aggrieved or whose interests are adversely affected" by a Commission order granting a construction permit. Again, Orange Park has specified a concrete, economic interest that has been perceptibly damaged by the Commission's award. These allegations amply qualify Orange Park as an "aggrieved" party within the meaning of § 402(b)(6). *See FCC v. Sanders Brothers Radio Station*, 309 U.S. 470, 476–77, 60 S.Ct. 693, 698, 84 L.Ed. 869 (1940); *cf. Office of Consumers Counsel v. FERC*, 808 F.2d 125, 128–29 (D.C.Cir.1987) (interpreting § 19(b) of Natural Gas Act, granting standing to "aggrieved" parties, to require proof of "concrete perceptible harm of a real, non-speculative nature"). Moreover, the statute leaves no doubt that disappointed applicants like Orange Park are within the "zone of interests" protected by the statute. *See* 47 U.S.C. § 402(b)(1), (6); *see also FAIC Securities, Inc. v. FDIC*, 768 F.2d 352, 356–57 (D.C.Cir.1985) (use of "aggrieved" language in APA, 5 U.S.C. § 702 (1982), indicates Congressional intent to pare back traditional prudential standing limitations). *See generally Clarke v. Securities Industry Association*, —— U.S. ——, 107 S.Ct. 750, 93 L.Ed.2d 757 (U.S.1987) (reaffirming zone of interests test for Administrative Procedure Act, 5 U.S.C. § 702 (1982), elaborated in *Association of Data Processing Service Organizations, Inc.*, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184).

Satisfied that Orange Park has fulfilled standing requirements for contesting the award to Clay, we turn at last to the specifics of that challenge.

**C**

Orange Park assails the Commission's largesse in permitting Clay to cure its violation of the ownership-change provision, namely section 73.3572. That rule, Orange Park argues, requires elimination of an application from consideration with competing applications when amendments to the application, whenever filed, effect a 50% change in ownership of the proposed facilities. The Commission does not dispute Orange Park's interpretation of the rule, nor its contention that the rule applied to the amendments Clay filed on the A and B cut-off dates. The FCC nonetheless main-

---

spacing problem ... [and] the right to refile an application for the Channel 25 facility." Supplemental Brief of Appellant at 7. That contingencies may arise which cause Orange Park to decide not to reapply or which defeat its application does not point to a lack of redressability. *See Village of Arlington Heights*, 429 U.S. at 261–62, 97 S.Ct. at 561; *cf. DKT Memorial Fund, Ltd. v. Agency for Int'l Dev.*, No. 86–5250, slip op. (D.C.Cir. Feb. 13, 1987) (group would have standing to challenge Government policy for awarding funds as long as group showed it was otherwise qualified to receive funds); *Greater Tampa Chamber of Commerce v. Goldschmidt*, 627 F.2d 258, 264–65 (D.C.Cir.1980) (appellant failed to establish redressability because even if court granted relief sought, there were independent obstacles to redress of injury which judicial action could not remove). We can discern no "absolute barriers" to Orange Park's competing for channel 25 were the award to Clay overturned by the Commission. *See Greater Tampa*, 627 F.2d at 264–65. In particular, redress of the injury alleged by Orange Park does not depend on the actions of third parties not before the court, as have most of the instances in which the Supreme Court and this court have found a lack of redressability. *See, e.g., Simon v. Eastern Kentucky Welfare Rights Org.*, 426 U.S. 26, 42–46, 96 S.Ct. 1917, 1926–28, 48 L.Ed.2d 450 (1976); *Greater Tampa*, 627 F.2d at 263–65; *cf. Van Aulock*, 720 F.2d at 181, 185. Having determined that Orange Park has devised plans sufficiently detailed to enable it to compete for the facility, we are not required further "to engage in undue speculation as a predicate for finding that [Orange Park] has the requisite personal stake in the controversy." *Village of Arlington Heights*, 429 U.S. at 262, 97 S.Ct. at 561; *cf. CACI, Inc.—Federal v. United States*, 719 F.2d at 1574–75 (to have standing disappointed bidder for government contract need not show that "but for" award to competing bidder, appealing bidder would have received award). In fact, predicting the likelihood that Orange Park could be found qualified to compete for a permit, and would receive it, is particularly inappropriate for a reviewing court, since Congress has left these determinations in the first instance to the Commission, not the courts. *See infra* section III–C.

tains that allowing Clay to avoid dismissal was justified because of the confusion caused by the old Broadcast Bureau's practice of counting only amendments filed after the A cut-off.

Orange Park relies primarily on *Reuters,* 781 F.2d 946, for the proposition that the FCC has impermissibly strayed from its own rules. *See generally Vitarelli v. Seaton,* 359 U.S. 535, 79 S.Ct. 968, 3 L.Ed.2d 1012 (1959); *Service v. Dulles,* 354 U.S. 363, 77 S.Ct. 1152, 1 L.Ed.2d 1403 (1957). In *Reuters,* the FCC rescinded Reuters' newly awarded licenses for microwave radio stations in order to allow a second applicant, Associated Information Services, whose applications had been filed late, to be considered for the awards along with Reuters. Although expressly finding that the licenses had been properly granted, the Commission divested Reuters of them upon finding that Associated had misread an ambiguous FCC report as controlling the filing deadlines in that situation. *Id.* at 949–50. We reversed the FCC for the "simple but emphatic" reason that

> the Commission properly granted licenses to Reuters pursuant to the express provisions of its rules. Moreover, neither the [Commission staff] nor the Commission itself embraced the proposition that the [report on which Associated relied] was intended to alter the FCC's long-standing rules governing applications.

*Id.* at 950. In sum, we determined that the Commission could not justify a departure from its rules in light of (1) the deprivation visited upon Reuters, which had faithfully abided by the rules and held licenses in hand, and (2) the tenuous basis for Associ-

ated's ill-timed application. *Reuters* did not hold, as Orange Park would have it, that an agency may never grant exceptions to its rules. Indeed, we could not have held so broadly without upsetting precedent recognizing that "[a]ny rule of general applicability will involve particular cases of hardship, for which an agency would be empowered to make individual dispensations." *Basic Media,* 559 F.2d at 833; *see also WAIT Radio v. FCC,* 418 F.2d 1153, 1157 (D.C.Cir.1969) ("The agency's discretion to proceed in difficult areas through general rules is intimately tied to the existence of a safety valve procedure for consideration of an application for exemption based on special circumstances.").

■ Contrary to Orange Park's assertions, the facts before us differ in vital respects from those in *Reuters.* For one thing, the FCC's action in this case works no deprivation of a vested property interest. As we expressly recognized in *Reuters,* "such a vested interest must be given due weight in any consideration of fundamental fairness." 781 F.2d at 950 n. 5; *see also Teleprompter Cable Systems v. FCC,* 543 F.2d 1379, 1384–87 (D.C.Cir.1976) (reversal of Commission's refusal to grant necessary certificate to cable television company to which local authority had granted franchise).[19] Furthermore, in *Reuters* the beneficiary of the Commission's departure from its rules fell into error by virtue of its own misreading of a Commission report which, though ambiguous, did not specifically address the filing of the applications at issue and which was by its express terms subject to the longstanding rules which *did* govern such filings. There was thus no *reasonable* reliance in *Reuters*

---

**19.** As counsel for the Commission correctly pointed out at oral argument, a licensee's interest in a broadcast license (or a construction permit, *see supra* note 1) is not a full-fledged, indefeasible property interest, since it is limited in duration, and held only so long as the licensee operates in the public interest. *See Sanders Brothers Radio Station,* 309 U.S. at 475, 60 S.Ct. at 697. But neither is it a non-protected interest, defeasible at will. Indeed, to suggest as much would, among other things, throw considerable doubt on the Commission's well-known

recognition of a renewal expectancy that leads applicants to vie for licenses which, if awarded, will require a significant expenditure of resources. *See, e.g., Committee for Community Access v. FCC,* 737 F.2d 74, 77–78 (D.C.Cir.1984). We recognized in *Reuters* that this interest is entitled to recognition in circumstances requiring the balancing of equities, such as when a court or agency must decide whether in the interest of fairness to waive application of a general rule.

on Commission rulings or staff representations.

■ Here, on the contrary, it appears that the source of confusion over the filing dates was the Commission's own staff. *Cf. New York State Energy Research & Development Authority v. FERC*, 746 F.2d 64, 65–66, 68 (D.C.Cir.1984) (agency acted arbitrarily and capriciously in applying new filing rules to party that followed old rules, in reliance on agency manual and agency officials). In further contrast to *Reuters*, it was the staff's practice which, though incorrect, specifically addressed the issue of how to determine whether a major transfer of control had taken place; the full Commission had never squarely resolved the issue. *See Bamford v. FCC*, 535 F.2d at 82 ("[A]n applicant should not be placed in the position of going forward with an application without knowledge of the requirements established by the Commission, and elementary fairness requires clarity of standards sufficient to apprise an applicant of what is expected."). Under these circumstances, we conclude that, upon finding that Clay had reasonably relied on the Bureau's interpretation of section 73.3572 and its method of processing applications, the Commission could reasonably have permitted Clay to cure its violation of that rule.[20]

**D**

■ But a problem remains. As we have stated in the clearest terms, "[w]hen an agency decides to make an exception to the general rule, it is ... required to have stated the reasons for the exception clearly on the record." *Basic Media*, 559 F.2d at

833. In our judgment, the Commission's elliptical remark that its action was justified by "the confusion caused by the Bureau's processing practice," *see supra* note 10, fails to satisfy this standard. Beyond finding that the staff practice was a potential source of confusion, the FCC made no findings that Clay had in fact relied on the practice or that such reliance was, under the circumstances, reasonable. Although we hold that the Commission was not precluded in law from granting an exception to its rules, we cannot affirm its doing so without adequate findings of reasonable reliance on the asserted Bureau practice.

We therefore vacate that portion of the Commission's decision permitting Clay to cure its violation of section 73.3572 and remand to the agency for the purpose of determining whether Clay in fact reasonably relied upon the Bureau's interpretation. If Clay fails to satisfy the requirement of reasonable reliance, then the Commission must reassess the entire set of circumstances, including considering the possibility of affording both parties the opportunity to submit applications conforming with the Commission's rules. For the reasons already stated, we affirm the remainder of the decision.

*Judgment accordingly.*

---

**20.** We are not presented with the kind of rule to which the FCC has never carved out exceptions. *Cf. Basic Media*, 559 F.2d at 833. On at least one prior occasion, an applicant for an FM radio station whose amendments effected a ma-

jor transfer of ownership under rules closely analogous to section 73.3572 was permitted to cure the violation rather than suffer dismissal. *See Grace Missionary Baptist Church*, 80 F.C. C.2d 330, 337–38 (Comm'n 1980).