RALVIN PACIFIC PROPERTIES,
INC. et al. Plaintiffs

v.

UNITED STATES of America,
et al. Defendants.

Civ. A. No. 93–610.

United States District Court,
District of Columbia.

Dec. 5, 1994.

Michael Lee Martinez, Holland & Knight, Washington, DC, for plaintiffs.

James Robert Layton and Bernadette C. Sargeant, U.S. Attorney's Office, Washington, DC, for defendants.

## OPINION

SPORKIN, District Judge.

The plaintiffs in this case, Ralvin Pacific Properties (RPP) and its affiliate, Ralvin Pacific Development (RPD), are disappointed bidders in a government procurement to provide a building for the Veterans Administration (VA) in San Diego, California. The General Services Administration (GSA) ran the procurement and awarded the contract to MV Associates (MVA) on October 31, 1992. The plaintiffs have charged that there were a number of irregularities in the bidding process, including bias against them, fraud on the part of the awardee, and the improper disclosure of information by the GSA to the awardee between the first and second best and final offers (BAFO). Plaintiffs have requested that the contract be awarded to them, or in the alternative, that the procurement be conducted again in whole or in part.

### FINDINGS OF FACT

1) On September 16, 1990, the GSA placed an advertisement in the *San Diego Union,* announcing that the GSA was looking to lease approximately 70,000 square feet of office and clinic space for the VA.

2) At the time, the VA was leasing space in a building at 2022 Camino Del Rio North in San Diego, owned and managed by RPP.

3) The GSA conducted on-site market surveys of a number of proposed sites, including those of the plaintiffs and the awardee, from October 16 through October 18, 1990.

4) Michael Cashman, the GSA realty specialist assigned to the VA procurement, conducted the inspections with representatives from the bidding companies. Afterwards, he filled out lease market surveys.

5) On the Ralvin survey he wrote that the proposed building was capable of meeting the government's requirements provided that confirmation was obtained that the site was not in a flood plain.

6) Cashman wrote on the MVA survey that it too was capable of meeting the government's requirements if the City of San Diego verified that it would build another means of entrance to and exit from the property. At the time, there was only one road into the site, which also is the road to Jack Murphy Stadium. On game days, the traffic on the road goes only to the stadium before the game and away from the stadium after games.

7) The GSA issued an extensive and detailed Solicitation For Offer (SFO) for the project on April 10, 1991. The SFO laid out the bases on which the award was to be made. There were five factors: 1) price, 2) handicapped accessibility, 3) early delivery of space, 4) availability of space for future expansion, and 5) the use of renewable energy in the offered space. Price was to be given weight equal to the four other factors combined.

8) In June 1991, both MVA and Ralvin made initial proposals to the GSA.

9) Ralvin initially proposed both a retrofit of the building the VA was occupying (the RPP proposal) and a build-to-suit building adjacent to the VA building (the RPD proposal).

10) RPP's proposal to retrofit the VA building did not meet the GSA requirement that the building's floorplate be over 20,000 square feet. As a result, RPP made an initial proposal, but never submitted either a first or second BAFO. The RPD proposal remained in consideration.

11) MVA submitted a proposal for a build-to-suit building on a site near Jack Murphy stadium as part of a proposed development to be called Mission City.

12) Both RPD and MVA submitted a first set of BAFOs by the November 15, 1991 deadline.[1]

13) Sometime after the first BAFO, and before any determination had been made as to who was to be the prospective awardee, Michael Cashman submitted GSA Form 1503 to the GSA Credit and Finance Division in Kansas City (CFD) requesting that it do a

---

1. Another company, Sammis, also submitted proposals for the first and second BAFO. Sammis's name changed between the first and second BAFO. In this opinion, the bidder will be referred to throughout as Sammis. Neither Sammis nor MVA is a party in this proceeding.

financial capability determination of all three offerors.

14) In late 1991, the CFD made a negative financial determination on RPD. CFD found RPD financially incapable because it was a new company with no assets or liabilities, it lacked a firm guarantee by another company, and had provided no conditional commitment of funds.

15) The CFD was also unable to make a positive financial determination of MVA at the time because it had received only information on Fenton, an affiliate of MVA, and because there was no conditional commitment of funds to build the project.

16) Because of changes in the solicitation and deficiencies in all the offers in February 1992, the GSA decided to reopen negotiations with the bidders and announced a second round of BAFOS.

17) The GSA sent the bidders an amendment to the SFO (Amendment 6), which addressed the changes in the solicitation.

18) Amendment 6 was accompanied by a cover letter to each of the bidders, which announced the amendment and pointed out certain deficiencies to each offeror. The letter to RPD made no mention of the fact that the GSA was concerned that the RPD site was in a zone A floodplain or that there were problems with the financial information that Ralvin had submitted to the GSA.

19) The cover letter to Mark Greenberg, the broker for MVA, pointed out, among other things, that MVA had failed to provide certain essential financial information to the Credit and Finance Bureau, specifically, a conditional commitment of funds, as required in the SFO.

20) Following Amendment 6, the GSA established a March 27, 1992 deadline for the second BAFO.

21) In January, 1992 Mark Greenberg, the broker for MVA, received information from someone at the GSA that MVA had not been the "low offeror" in the first BAFO. Greenberg conveyed the information to MVA in a letter dated January 30, 1992 which stated as follows:

The legal department and financial review department [of GSA] cannot accept our Best and Final Offer submitted on November 15, 1991, because of legal issues (exceptions and ownership information) and we are *not* the lowest offeror. Negotiations for the subject requirement will be reopened in a few weeks. Mike Cashman is currently on leave until February 10, 1992, so nothing happens until he returns. (emphasis in the original)

22) At this point, RPD's offer was lower than MVA's—$30.96 per square foot compared with $32.00 per square foot for the fixed term of the lease.

23) MVA, acting on the "*not* the lowest offeror" information provided in the Greenberg letter, changed its proposal between the first and second BAFO by offering 6 months of free rent, which lowered the price of its offer to $30.40 per square feet during the fixed term of the proposed lease. This made MVA's offer lower than that submitted by RPD.

24) Both MVA and RPD submitted timely proposals for the second BAFO.

25) Following the submissions for the second BAFO, GSA determined that Sammis had submitted the lowest priced proposal. Despite its low bid, Sammis was eliminated from consideration as the prospective awardee because it had included a number of conditions in its proposals that were not acceptable to the GSA.

26) GSA's Cashman determined that MVA proposed rental submitted with its second BAFO (based on net present value analysis) was lower than RPD's.

27) In late April 1992, on Cashman's recommendation, Penelope Barron, the contracting officer, determined that MVA should be the prospective awardee. GSA notified MVA of this fact by sending proposed lease forms to MVA. At this time, GSA LA requested that CFD do another financial capability determination of MVA.

28) RPD was not notified at this time that it was not the successful bidder.

29) The information MVA sent to the CFD included a guarantee of MVA by H.G. Fen-

ton Material Company (Fenton), audited financial statements for Fenton, and *unaudited* financial statements of MVA, which claimed assets of over $100 million in land. Much of the land was valued as developed property, when in fact the property had not been developed.

30) On behalf of MVA, James Purvis, Project Manager of the Mission City Development, signed the certification on GSA Form 527. It stated in part that "we furnish the above as a true and correct statement of our financial condition" and that "[w]e agree to notify you immediately in writing of any materially unfavorable change in our financial condition."

31) On or about May 4, 1992, Mark Robinson of CFD contacted MVA to learn the status of a $9.3 million dollar Home Fed Bank loan owed by MVA, which appeared to be in default. Part of the collateral for the loan was the land on which the proposed VA building was to be built.

32) On June 9, 1992 Home Fed informed GSA that an extension had been granted on the $9.3 million loan and that it was therefore not in default.

33) On June 16, 1992, the CFD made a positive financial capability determination for MVA. The report by senior analyst Mark Robinson relied on, among other things, awardee assets of "a low nine figure in land", a letter of interest in financing the project from Seidler Realty Advisors (SRA) and the guarantee by Fenton.

34) On August 8, 1992 the $9.3 million loan owed by MVA again went into default. MVA did not tell anyone in the GSA that the loan was in default.

35) On October 31, 1992 the GSA awarded the lease to MVA. On November 2, 1992 the GSA informed RPD by letter that it had not won the award.

36) During 1992, MVA had some reservations about whether it would construct the VA building if it won the award and started to explore the possibility of selling or "flipping" its award. For example, on May 14, 1992, MVA entered into an agreement to sell the award and the land the VA building was to be built on to another company if it won

the award. MVA did not inform the GSA of this fact.

37) On November 10, 1992 RPD filed a protest of the award with the General Accounting Office (GAO), which automatically caused a stay of the award under 31 U.S.C. § 3553(d).

38) On November 20, 1992 the stay was lifted as a result of GSA findings that continued performance of the contract was necessary.

39) This case was filed on March 24, 1994.

40) On April 12, 1994 this Court entered a preliminary injunction pending a trial on the merits.

## FINDINGS OF FACT PERTAINING TO GSA'S RELATIONSHIP WITH RPD

41) The GSA did not give RPD's proposal the same consideration it gave to MVA.

42) GSA found RPD's proposal to be unacceptable on the basis of price, inadequate financial condition and because its proposed site was in a flood plain.

43) At no time did GSA advise RPD of these shortcomings. The GSA did not seek an explanation from RPD even though GSA was aware that RPD was a substantial company having been the owner of the existing Veterans' Administration building for some ten years and even though the GSA knew that the floodplain issue had been fully satisfied by RPD.

44) Although someone at the GSA advised MVA that it was not the lowest bidder, no one at GSA provided similar information to RPD.

45) The evidence in the record demonstrates that there were flaws in the proposed MVA site while there were no such flaws in the RPD site. Indeed, based on location of the then proposed site, it is clear that RPD's site was a better site.

46) Based upon the above, the Court finds that MVA was treated on a more favorable basis than RPD.

## CONCLUSIONS OF LAW

Plaintiffs who attempt to overturn a government procurement decision:

> bear a heavy burden of showing either that (1) the procurement officials decision on matters committed to his own discretion had no rational basis, or (2) the procurement procedure involved a clear and prejudicial violation of applicable statutes or regulations.

*Kentron Hawaii, Ltd. v. Warner,* 480 F.2d 1166, 1169 (D.C.Cir.1973). In this case, the Court finds that there has been a clear violation of applicable procurement regulations, specifically 48 C.F.R. § 3.104–3(b), § 3.104–3(b)(3) and 48 C.F.R. § 570.208–5(a).

## ANALYSIS

*Standing*

 Defendants have challenged the standing of both RPP and RPD to contest the award of the VA procurement to MVA. This Circuit has held that disappointed bidders in federal procurements have standing to challenge the award of government contracts. *See Scanwell Laboratories v. Shaffer,* 424 F.2d 859 (D.C.Cir.1970). In order to have standing, a disappointed bidder must be within the zone of active consideration for the award. *See National Federation of Federal Employees v. Cheney,* 883 F.2d 1038, 1053 (D.C.Cir.1989). Because RPP never submitted either a first or second BAFO and could not have met the requirements of the solicitation because the building it proposed had too small a floor plate, it does not have standing. *Id.*

The Court finds no merit in the government's challenge of RPD's standing. RPD submitted both first and second BAFOs. It was therefore within the zone of active consideration and has standing.

*Federal Acquisition Regulations*

 The Federal Acquisition Regulations explicitly forbid procurement officials from revealing certain information during the course of the procurement proceedings. The regulations prohibit the knowing disclosure of "any ... source selection information." 48 C.F.R. § 3.104–4(b) and 3.104–4(b)(3). Revealing "ranking of bids, proposals, or com-petitors" constitutes improper disclosure of "source selection information." 48 C.F.R. § 3.104–4(k)(2)(viii).

This Court finds that someone at the GSA did disclose to Mark Greenberg, MVA's broker, that MVA was not the low offeror after the first BAFO. On January 30, 1992 Mark Greenberg sent a letter to Robert Wilhelm, Vice–President of Fenton, an affiliate of MVA, in which he stated that "the legal department and financial review department [of GSA] cannot accept our Best and Final Offer submitted on November 15, 1991, because of legal issues (exceptions and ownership information) and we are *not* the lowest offer." The Court finds it significant that the information was indeed accurate and that Mr. Greenberg did not hedge his statement in any way. The GSA was the only source from which he could have been *certain* that MVA was *not* the lowest offeror. In addition, the Court believes that the testimony of Robert Wilhelm further supports its finding that there was an improper disclosure of bidder ranking by the GSA. Robert Wilhelm stated that the source of Greenberg's information as to the ranking of the MVA offer was his communications with the GSA. The Court finds Mr. Wilhelm's testimony on this point credible.

Mark Greenberg testified that he had not received information as to rankings from GSA and that he falsely gave the impression in the January 30, 1992 letter that he knew that MVA was not the low offeror. However, after having heard the witness' testimony and observed his demeanor, the Court does not find this and certain other portions of the testimony credible. Besides evaluating the witness' demeanor, the Court took into account that the witness has used a *curriculum vitae* in his professional work in which he falsified his educational experience. In addition, the witness stands to lose a large commission on this project if MVA is not finally awarded the project and therefore has an incentive to deny any impropriety on the part of the MVA and the GSA.

By disclosing the rankings to MVA, between the first and second BAFO, the GSA gave MVA an unfair advantage over its competitor, RPD, in the procurement process.

This disclosure constitutes an obvious and prejudicial violation of procurement regulations. Clearly MVA treated the information as factual when it lowered the cost of its proposal after receiving the information between the first and second BAFO by offering the VA six months free rent. The change from the first to the second BAFO lowered MVA's bid from $32.00 per square foot for the fixed term of the lease to $30.40, which made its bid lower than that submitted by RPD. Such an advantage blatantly denied RPD its "basic right to be treated fairly in the procurement process," *Dynalectron Corp. v. United States,* 659 F.Supp. 64, 69 (D.D.C.1987), and requires that the award to MVA be voided. *See Kentron,* 480 F.2d at 1169.

This Court is also concerned with a number of other irregularities in the procurement process. MVA did not act truthfully towards the GSA in a number of instances. It did not live up to its obligation to keep the GSA informed as to any material changes in its financial condition. On April 27, 1992 James Purvis, MVA's Project Director for Mission City, certified that MVA would inform the GSA of any material changes in MVA's financial condition. MVA did not disclose to the GSA that at the time of the award, MVA was in default on a $9.3 million Home Fed loan. Part of the collateral for this loan was the land on which MVA had proposed to build the VA building. It is clear that GSA considered this information material because the CFD had previously asked MVA about the status of its Home Fed loans after CFD had learned that some were in "technical default."

MVA submitted unaudited financial statements to CFD, which stated that MVA had some $121 million in assets, primarily in land. The valuations purport to be of developed property. For example they list a hotel valued at $6 million (500 rooms at $12,000 per room). In fact, the hotel has not been built. Mark Robinson of GSA's CFD testified that he believed that the valuations were for property that had been developed. He further testified that he would have wanted true information in making his financial capability determination.

The Federal Acquisition Regulations require that the "contracting officer shall make a determination that the prospective offeror is responsible with respect to the lease being considered." 48 C.F.R. § 570.208-5. By failing to fulfill its obligation fully and accurately to inform the GSA of material financial information, MVA made it impossible for the GSA to make a meaningful determination of MVA's financial responsibility.[2]

The government takes the position that this Court cannot consider MVA's improper conduct as a basis for overturning its bid to MVA. Essentially, the government's contention is that a disappointed bidder has no standing to pursue such contentions.

The Court finds that the government's position lacks merit because it contradicts one of the purposes of giving standing to disappointed bidders in government procurements. Finding standing in disappointed bidders serves to protect both the economic interests of disappointed bidders *and* the public interest. *See Orange Park Florida T.V. Inc. v. F.C.C.,* 811 F.2d 664, 672 (D.C.Cir.1987) ("The basis for this recognition [that disappointed bidders have standing] is that a wrongful award of a government contract constitutes a discrete economic injury to unsuccessful bidders, who therefore have an incentive to vindicate the public interest as well as their own by insisting on the integrity of the procurement process."). Because MVA failed to disclose material information and misrepresented material information, it prevented the GSA from making a thorough evaluation of MVA's financial capability and negatively affected the public interest.

RPD has standing to contend that the regulations were violated, and the Court finds that there was not a proper determination of financial responsibility because MVA's

---

**2.** Plaintiff put on an expert witness who testified that GSA had done a completely inadequate job of assessing MVA's financial capability even with the information that it did have. The witness pointed to, among other things, the fact that MVA's balance sheets showed $468 in cash, and the approximately 30% decline in MVA's guarantor, Fenton's net worth from 1990 to 1992.

improper conduct prevented one from taking place.[3]

This Court finds the procurement was flawed in a number of important respects. First and foremost, it was a violation of the procurement regulations for the GSA to tell MVA that its first BAFO was not the lowest bid and to provide it with the ability to submit a lower second bid based on this information. Second, the Court finds that there was a violation of the Federal Acquisition Regulation concerning the determination of financial capability. Third, the Court believes that the GSA badly mishandled the flood plain issue. Fourth, this Court cannot understand the government's professed lack of concern with MVA's repeated efforts to sell the award *before it had even built the building*. Fifth, having seen videotapes of the two proposed sites and having heard testimony on their relative merits, the Court is baffled that the GSA could have found the MVA site—in a rock quarry by Jack Murphy Stadium—to be even minimally acceptable.

The GSA has stated one of the reasons why RPD's proposal was not chosen was that it was located in a zone-A floodplain. The deficiency letter sent to RPD made no mention of the floodplain issue. The GSA Contracting Officer Penelope Barron testified that this problem should have been mentioned in the deficiency letter. The omission is especially troubling since it was clear that the floodplain issue had been resolved because the RPD site was no longer in a zone A floodplain due to engineering work done in the area. In addition, RPD had been previously advised by Cashman of the GSA that the floodplain issue was not a problem. The handling of this issue and the failure to provide RPD the opportunity to respond to questions concerning the proposed financing of the project is obvious evidence of bias against RPD.

There is clear evidence in the record that MVA made a number of attempts to sell or "flip" the award before it even had built the

building. At all stages of the proceeding, the GSA has attempted to minimize the importance of this fact. First, GSA witnesses have asserted that assignment of leases is common in the real estate industry. Second, they have said that since GSA must approve any assignment, they do not need to know of a bidder's efforts to market an award. *See* Anti–Assignment Act, 41 U.S.C. § 15.

Neither of these rationales is convincing. Penelope Barron, a contracting officer with 10 years experience, testified that although it may be common for an awardee to lease or sell to a new company a building inhabited by a government agency *after* the building has been built, she had never heard of an attempt to flip an award *before* the awardee had built the building.

To allow a company that has no intention of performing on the award to be the awardee would seem to undercut much of the rationale of the procurement process. The government spends time, money and resources to determine whether a potential awardee is both technically and financially capable of performance. If a bidder has no intention of performing under the contract, the time and money spent investigating the bidder is simply wasted. The anti-assignment provisions do not adequately protect the government against an awardee that is only interested in flipping the award.[4] Once the contract has been awarded, the government has much less leverage over an awardee that announces that it has no intention of building the project and proposes to assign it than it has over bidders in the initial bidding stage.

Since the GSA does not consider "flipping" a problem in its procurement process, the Court does not find that MVA's nondisclosure of its efforts to assign the award constitutes fraud sufficient to void the award. This award was flawed in other respects sufficient to require a new procurement, however, and it is urged that the GSA take

---

**3.** *Cf. Matzer & Associates, Inc. v. Warner,* 348 F.Supp. 991, 995 (M.D.Fla.1972) (holding that the government's reliance on incorrect information submitted by the bidder is arbitrary and unreasonable).

**4.** While the GSA seems to attach little importance to the question of "flipping," the reasons why MVA wanted to "flip" the award are at least relevant in evaluating MVA's financial capability.

this factor into consideration in the new procurement process.[5]

*REMEDY*

The plaintiff has proposed that the Court award the contract to RPD on the basis of the record before it. This the Court will not do. Such an award to a disappointed bidder is an extraordinary remedy to be applied only if it is clear that the disappointed bidder would have won the contract absent the flawed nature of the bidding process. *Delta Data Systems Corp. v. Webster,* 744 F.2d 197, 204 (D.C.Cir.1984). This Court does not desire to become a GSA contracting officer. What's more, the record is not clear that RFD would be an appropriate awardee. There were problems with RPD's proposal, including a failure to provide adequate financial information.

The defendants, relying on *Delta Data Systems Corp. v. Webster,* 755 F.2d 938 (D.C.Cir.1985) (*Delta Data II*), have argued that even if the procurement process was flawed, equitable relief is not appropriate and that the plaintiff's only remedy is for damages under the Tucker Act. The Court is unpersuaded by defendant's argument. Unlike in *Delta Data II,* there has not already been "considerable performance ... under the ... contract." *Id.* at 939.

The proper remedy in this case is for the GSA to conduct the procurement again. The Court requests that within thirty days the government submit a proposal for a new procurement that will eliminate the possibility that the irregularities that infected this procurement process will not recur. An appropriate order follows.

**ORDER**

Having read the submissions of the parties and heard the testimony presented at trial, this Court hereby

**ORDERS** that the award to MVA to build the VA building in San Diego, California be voided. It is hereby further

**ORDERED** that the GSA conduct the procurement again. It is further hereby

**ORDERED** that the GSA submit for the approval of this Court within thirty days a proposal for the new procurement that will prevent the recurrence of the failures elaborated in the opinion above.

---

5. The flipping issue becomes even more important where "security issues" are involved. Just think how serious it would be for criminal syndicate money to be behind a proposed FBI facility or a hostile nation to send a surrogate to bid on a national security facility. It has, indeed, been very difficult for the Court to understand why the GSA has no interest in learning whether a proposed bidder for a government facility is simply a front for another entity.