996 F.2d 386
 302 U.S.App.D.C. 120, 26 Fed.R.Serv.3d 560
 GARDEN STATE BROADCASTING LIMITED PARTNERSHIP, Appellant,
v.
FEDERAL COMMUNICATIONS COMMISSION, Appellee,
Pinelands, Inc., Intervenor.
WHITELY COMMUNICATIONS, Appellant,
v.
FEDERAL COMMUNICATIONS COMMISSION, Appellee,
Pinelands, Inc., Intervenor.
GARDEN STATE BROADCASTING LIMITED PARTNERSHIP, Appellant,
v.
FEDERAL COMMUNICATIONS COMMISSION, Appellee,
Pinelands, Inc., Intervenor.
GARDEN STATE BROADCASTING LIMITED PARTNERSHIP, Appellant,
v.
FEDERAL COMMUNICATIONS COMMISSION, Appellee,
BHC Communications, Inc., Intervenor.
 Nos. 91-1043, 91-1599, 92-1065 and 92-1388.
 United States Court of Appeals,
District of Columbia Circuit.
 June 29, 1993.
Rehearing and Suggestion for Rehearing
En Banc Denied Sept. 10, 1993.
 
 [302 U.S.App.D.C. 121] On Appeal from the Federal Communications Commission.
 On brief were John J. Schauble and John K. Cooper for the appellant in Nos. 91-1043, 92-1065 and 92-1388. Lewis I. Cohen and Roy W. Boyce also entered appearances.
 William L. Whitely entered an appearance for the appellant in No. 91-1599.
 On brief were Renee Licht, Acting Gen. Counsel, Daniel M. Armstrong, Associate Gen. Counsel, and Sue Ann Kanter, Counsel, F.C.C., for the appellee in all cases.
 On brief were J. Roger Wollenberg, Joel Rosenbloom and William R. Richardson, Jr., for the intervenors in all cases.
 Before BUCKLEY, D.H. GINSBURG and HENDERSON, Circuit Judges.
 Opinion for the court filed by Circuit Judge KAREN LeCRAFT HENDERSON.
 KAREN LeCRAFT HENDERSON, Circuit Judge:
 
 
 1
 Garden State Broadcasting Limited Partnership (Garden State) appeals to this court three separate, but related, orders of the Federal Communications Commission (FCC or the Commission). In its first appeal, Garden State challenges the Commission's dismissal of its application for a television station license. The FCC determined that Garden State had abused the licensing process by filing solely in order to obtain a cash settlement from the existing station operator and that Garden State lacked candor because it withheld information about its motivation for filing. We uphold the Commission's decision.
 
 
 2
 In its second and third appeals, Garden State challenges the FCC's approvals of subsequent [302 U.S.App.D.C. 122] transfers of the television station to new license holders. We conclude that Garden State's second appeal is moot and that it lacks standing to raise the claims in its third appeal. Therefore, we dismiss the appeals. We also sua sponte impose sanctions on Garden State for filing and prosecuting three patently frivolous appeals.[1]
 
 I.
 
 3
 The events leading to Garden State's first appeal began in 1986 when Mainstream Television Limited Partnership (Mainstream) applied to the FCC for a permit to operate Channel 9 in Secaucus, New Jersey.[2] Jean Wells served as the sole general partner of Mainstream and was to be the general manager of the station. Sidney Fetner was one of several limited partners. Lewis Cohen and his law firm, Cohen & Berfield, represented Mainstream.
 
 
 4
 While Mainstream's application was pending, RKO applied to assign the station to WWOR-TV, a subsidiary of MCA, Inc. (MCA). Over Mainstream's objection, the FCC granted the assignment. In so doing, the FCC rejected Mainstream's assertion that RKO's service to northern New Jersey was inadequate. Mainstream sought review in this court but withdrew its appeal after it signed a settlement agreement with RKO by which RKO paid Mainstream $5.37 million on April 1, 1987. Wells received approximately $178,000, Fetner received $1.3 million and Cohen & Berfield was paid approximately $500,000 of the settlement proceeds. WWOR began operating Channel 9 two days later.
 
 
 5
 On April 30, 1987, less than four weeks after WWOR took over the station, Wells, Fetner and Cohen met in New York for dinner and began organizing Garden State to challenge anew WWOR's operation of Channel 9. Again, Wells agreed to serve as the sole general partner while Fetner served as one of twelve limited partners and funded the contribution of several other limited partners.
 
 
 6
 To prepare its challenge, Garden State hired an expert to analyze Channel 9's programming and determine if it met New Jersey's needs. Wells, who testified that she regularly watched Channel 9, continued to observe the programming to increase her familiarity with WWOR's operation of the station. On December 23, 1987, two days after WWOR applied for renewal of its license with the FCC, Garden State filed a mutually exclusive application to construct a station operating on the same channel. Citing the similarity between Garden State's application and the recently settled Mainstream challenge, WWOR contended that Garden State was abusing the FCC's application process and should therefore be disqualified. Almost two years later, not having achieved a resolution of the dispute, WWOR initiated settlement negotiations with Garden State. WWOR eventually agreed to pay Garden State approximately $2 million to settle, and, as required by the Federal Communications Act (the Act), 47 U.S.C. §§ 151 et seq., the parties submitted the agreement to an administrative law judge (ALJ) for approval. See 47 U.S.C. § 311(d). The ALJ ordered a hearing on the agreement to ascertain if it violated the Act's ban on settlements with applicants who file only to obtain a settlement. See 47 U.S.C. § 311(d)(3).
 
 
 7
 After the hearing, the ALJ approved the settlement, noting, however, that none of the participants in Garden State's April 30 organizational meeting could remember when that meeting had taken place. Because Garden State alleged that it had filed only after Wells perceived inadequacies in WWOR's programming, the ALJ recognized that the date of the initial meeting was a "material circumstance that is troubling in not being resolved with the precision of clear and convincing evidence." J.A. at 50. Nonetheless, [302 U.S.App.D.C. 123] he concluded that any adverse inference flowing from the failure to establish the timing of the initial meeting was offset by Garden State's vigorous prosecution of its application. Id. Despite the ALJ's explicit concern, Garden State made no attempt to reopen the record or to produce evidence documenting when the meeting occurred.
 
 
 8
 The FCC, however, concluded sua sponte that the record was inadequate to support the ALJ's findings and set aside the settlement. It declared that "repeated significant memory lapses" of Garden State's witnesses regarding the timing of the initial dinner meeting called into question Garden State's motivation in filing. J.A. at 39. The FCC also concluded that Garden State's "vigorous litigation" of the case consisted of nothing more than "a lengthy list of pleadings filed to prevent or delay discovery on the abuse of process issue itself." Id. Finally, the Commission stated that Wells's, Fetner's and Cohen's previous participation in the Mainstream application suggested that they knew settlement was possible, if not probable, when they filed the application. Id. Accordingly, the FCC remanded the case to the ALJ.
 
 
 9
 On remand, Garden State finally produced evidence that the organizational dinner meeting had in fact occurred on April 30th--much earlier than Garden State's witnesses had previously suggested. In his law firm records, Cohen discovered his April 30th airline ticket to New York City and an April 30th credit card receipt from the restaurant where Cohen met Wells before the two joined Fetner. In addition, Fetner's widow produced an April 30th credit card receipt from the restaurant where the organizational meeting occurred. The late disclosure of the evidence led the ALJ to conclude that Garden State had not been candid earlier in the application process. He also concluded that Garden State had abused the FCC process by filing only to obtain a settlement. The ALJ noted that in earlier testimony Garden State's witnesses had declared that its licensing challenge was premised "from its inception on perceived inadequacies" in WWOR's programming. J.A. at 1067. Because the ALJ concluded that Garden State's promoters could not have formed an opinion on WWOR's programming only 27 days after WWOR began operating the station, and because Wells had admitted as much in earlier testimony,[3] the ALJ determined that the April 30th date of the meeting undermined Garden State's professed reason for filing its application. Accordingly, the ALJ rejected Garden State's application.
 
 
 10
 Garden State filed timely exceptions to the ALJ's order. The Commission upheld the ALJ, finding that Garden State had abused the application process because its promoters had misled the ALJ about the date of the meeting in order to mask its desire to obtain a settlement. The Commission noted that Cohen's testimony suggested that Fetner was interested in obtaining a settlement from the beginning.[4] It concluded that the promoters' initial testimony that WWOR's inadequate programming was the sole motivation for Garden State's formation contradicted the promoters' subsequent testimony that concern about programming was simply one of several factors behind the decision to file an application.
 
 
 11
 The Commission also held that Garden State violated its duty of candor by failing to produce evidence of the April 30th meeting earlier. It noted that WWOR had, in discovery, specifically moved for the production of "all documents relating to or reflecting any meetings ... among Garden State's principals ... regarding the formation of Garden State." J.A. at 7. WWOR expressly sought production of documents in the control of Garden State's counsel, yet Cohen & Berfield did not turn over the two receipts establishing [302 U.S.App.D.C. 124] the date of the meeting until the FCC remanded the case. J.A. at 750. In addition, the Commission found that Garden State and its counsel were aware of the significance of the initial meeting long before they produced the evidence. J.A. at 8.
 
 
 12
 As a result of its findings, the FCC disqualified Garden State. It then found WWOR qualified to operate Channel 9. Garden State now appeals. We uphold the FCC.
 
 
 13
 * * * * * *
 
 
 14
 The events leading to Garden State's second appeal began in 1990 while Garden State's application for Channel 9 was still pending. Matsushita Electrical Industrial Company, Ltd. (Matsushita), a Japanese corporation, made a tender offer for MCA whose subsidiary, WWOR, operated Channel 9. Because Matsushita, a foreign corporation, could not legally own Channel 9,[5] MCA initiated a "spin-off" to divest itself of ownership of the station. See 47 U.S.C. § 310(b). It created a new American subsidiary, Pinelands, Inc. (Pinelands), to which it proposed to transfer ownership of Channel 9. MCA also proposed to distribute Pinelands stock to MCA's pre-tender offer shareholders.
 
 
 15
 MCA sought the Commission's approval of the transfer. It filed a Form 316--or short form--application which is used only when the transfer does not effect a substantial change in control. Garden State objected to the transfer and filed a petition to dismiss or deny. In the petition, Garden State argued that MCA was required to use Form 315, the FCC's long form, because the transfer resulted in a substantial change in control of the station. See 47 U.S.C. §§ 309(b), 309(d)(1).
 
 
 16
 The FCC granted MCA's application for a transfer on December 26, 1990. It ruled that MCA had properly used the short form application because the same shareholders retained control of the station and because the change was merely a corporate reorganization. The Commission also found Pinelands qualified as a licensee. Garden State filed an appeal challenging the transfer. Its appeal was filed before the Commission, in a separate proceeding, disqualified its application for Channel 9 on abuse of process and lack of candor grounds. As a result of Garden State's eventual disqualification, the Commission submits that Garden State lacks standing to prosecute the appeal. We conclude instead that its disqualification renders Garden State's appeal moot.
 
 
 17
 * * * * * *
 
 
 18
 The final dispute involving Garden State began about one year after the FCC granted MCA's application for a transfer. On May 14, 1992, Pinelands applied to the Commission to approve the transfer of Channel 9 to BHC Communications, Inc. (BHC). Twice during the year prior to its transfer application, Pinelands had filed ownership reports with the FCC in which it listed Mario Gabelli and Gabelli Funds, Inc. (collectively Gabelli) as voting, first, 5.1 per cent and, later, 11.9 per cent of its stock. Both times it indicated that Gabelli had no other attributable media interests. In its May 14th application, Pinelands reported that Chris-Craft Industries, Inc. (Chris-Craft) owned 95 per cent of the stock in BHC and that Chris-Craft and BHC controlled, either directly or indirectly, seven other television stations. The application also revealed that Gabelli owned 12.1 per cent of Chris-Craft stock[6] and that Gabelli had attributable interests in several other companies holding licenses for radio stations in New York and Illinois. BHC admitted to the Commission that the interests violated FCC rules but it requested a waiver.[7] See 47 C.F.R. § 73.3555(b).
 
 
 19
 Garden State filed a petition to dismiss and deny the transfer. In the petition, Garden State alleged that Pinelands intentionally misrepresented Gabelli's holdings in its earlier ownership reports to the FCC. It also claimed that Pinelands had violated Commission rules by failing to report the Gabelli interests in a timely manner. It urged the [302 U.S.App.D.C. 125] FCC to set a hearing regarding the specific rules Gabelli's interests violated. Finally, Garden State requested the FCC to delay approval of the transfer until judicial review of its application for Channel 9 was completed.
 
 
 20
 On August 21, 1992, the FCC issued a show cause order directed to Gabelli regarding the violations. It then granted the transfer application, emphasizing that the transfer would not prejudice judicial review of Garden State's earlier disqualification. The FCC also determined that Garden State lacked standing to challenge the transfer because it could not show that injury to it would result from the Commission's action.
 
 
 21
 Garden State also appeals this decision, making to us all of the arguments it previously presented to the Commission. The FCC continues to maintain that Garden State lacks standing to challenge the transfer. We uphold the Commission.
 
 II.
 A. Abuse of Process
 
 22
 The FCC may approve a settlement agreement "only if it determines that ... no party to the agreement filed its application for the purpose of reaching or carrying out" a settlement. 47 U.S.C. § 311(d)(3)(B). The Commission has made clear that a specific showing of improper motivation for the filing is necessary before it will refuse to approve a settlement. RKO Gen., Inc., 4 F.C.C.R. 4072, 4073 (1989). The parties dispute whether the record contains substantial evidence to support such a showing. The FCC found two factors "especially probative as indications" that Garden State filed to achieve a settlement: (1) the original version of its reason for filing was "at best without credibility and at worst false and misleading," and (2) compelling evidence that Fetner, a limited partner and major promoter, was not interested in owning a television station. WWOR-TV, Inc., 7 F.C.C.R. 636, 638 (1992) (J.A. at 3). As additional evidence of intent, the FCC relied on the fact that Wells, Fetner and Cohen formed Garden State almost immediately after they received large payments from the Mainstream settlement. Id.
 
 
 23
 Garden State's initial account of its formation makes little sense in light of the subsequent revelation that the formation meeting occurred on April 30, less than four weeks after the Mainstream settlement. Wells stressed that the dinner meeting occurred because she believed, after watching Channel 9's programs, that WWOR had not changed the programming to meet the needs of northern New Jersey. WWOR began operating the station on April 3. The Commission found that it was highly unlikely that WWOR would have had a chance to make significant programming changes within the first several weeks of its operation. We agree. Wells admitted as much in her testimony, stating that the dinner meeting could not have taken place on April 15 because "if it was April 15th [WWOR] had just taken the station over and they would barely have had time to make any changes at all." J.A. at 546. She concluded that she would not have made any judgment about programming before April 15. J.A. at 547. The Commission reasonably could have likewise found that she would not have reached a judgment by the time the meeting was held a mere fifteen days later.
 
 
 24
 In fact, by initially placing the date of the meeting much later, Wells and other Garden State promoters lent an artificial air of credibility to their asserted reason for formation. Wells several times stated that the meeting occurred in late spring or summer and at least once stated that she initially "spoke with Mr. Cohen ... sometime in the summer." J.A. at 546. According to her testimony, the meeting did not occur until after her conversation with Cohen. Finally, she noted that she became aware that WWOR's license was up for renewal in "late July or August" in another conversation with Cohen that apparently occurred before the organizational meeting with Fetner in New York. J.A. at 547. Cohen, who also participated in the April 30th meeting, testified that he checked his diary for the date before he testified because he was aware of the meeting's significance. J.A. 495-96. Cohen further testified that his initial telephone conversation with Wells occurred after April and [302 U.S.App.D.C. 126] that the dinner meeting occurred after that conversation. Cohen's best estimate was that the meeting occurred before his July 2, 1987 operation for thyroid cancer. J.A. at 498.
 
 
 25
 The timing of the events is critical. The nearer in time the formation of Garden State to WWOR's takeover of Channel 9, the less substantial Garden State's argument that it was motivated by WWOR's programming inadequacies becomes. Given that the meeting occurred on April 30, Wells's concerns about WWOR's programming must have been embryonic.
 
 
 26
 The Commission's second ground for its abuse of process determination is based on affirmative evidence that Garden State was interested only in settlement. Fetner, who arranged the financing of the enterprise, died before any hearings occurred. Cohen, however, testified that Fetner told him he was interested in "speculative kinds of situations where he could risk money and get a real big reward." J.A. at 1425. According to Cohen, Fetner also indicated that he was not interested in buying a radio or television station; rather, he wanted "the challenge and the chase."[8] Id. Fetner apparently made these statements to Cohen just days after the Mainstream settlement in which Fetner received a $1.3 million return on an investment of slightly more than $21,000. J.A. at 6.
 
 
 27
 Despite the strong evidence that Garden State was motivated by the prospect of settlement rather than concern over Channel 9's programming, Garden State points to three facts which, it claims, make the FCC's decision insupportable. First, none of the participants discussed settlement at the April 30th meeting. Second, MCA initiated the settlement discussions. Third, Garden State vigorously prosecuted its case and pursued its application by hiring an expert to evaluate programming and by preparing budget estimates for its operation of the station.
 
 
 28
 Garden State, however, could have been motivated by the settlement prospect even if Wells, Fetner and Cohen did not discuss settlement on April 30. All three of them had been involved in the Mainstream settlement. Fetner and Wells profited substantially from the settlement. Under 47 U.S.C. § 311(d), Mainstream's application, like Garden State's, would have been disqualified if the FCC had determined that Mainstream filed to obtain a settlement. Based on their experience, both Fetner and Wells were aware of the potential reward of settlement and of the dangers of discussing settlement as an objective.
 
 
 29
 Likewise, the fact that MCA initiated settlement discussions seems inconsequential. Faced with an abuse of process charge, Garden State could not have suggested settlement without risking disqualification. The only party that could have initiated the settlement talks without raising suspicion was MCA. MCA did so only after two years of litigation, which never progressed beyond the discovery stage, had brought the parties no closer to resolution.
 
 
 30
 Garden State also argues that its vigorous prosecution of the case demonstrates proper intent. In fact, Garden State's litigation strategy, as the Commission recognized, consisted of submitting "a lengthy list of pleadings filed to prevent or delay discovery on the abuse of process issue." J.A. at 39. Before the ALJ approved the settlement, Garden State filed at least nine motions attempting to prevent discovery. J.A. at 53 n. 13. All of them were denied. Id. During the same period, Garden State petitioned the ALJ five separate times to add an abuse of process issue against MCA and WWOR. J.A. at 729, 767, 849, 1019, 1045. These petitions were denied as well. This evidence suggests to us that Garden State was not vigorously prosecuting its application; rather, it was erecting roadblocks to delay the case and to prevent inquiry into its motives for filing.
 
 
 31
 Finally, Garden State asserts that its hiring of an expert and its budget estimate preparation indicate that its filing was proper. This evidence is not persuasive. A party seeking a license would pursue this information but so would a party seeking only settlement. Obtaining information about Channel [302 U.S.App.D.C. 127] 9 and preparing for its ownership strengthened Garden State's application and allowed it to act from a position of strength in settlement negotiations.
 
 
 32
 Fetner's, Cohen's and Wells's previous involvement with Mainstream, Cohen's testimony regarding Fetner's motivations, the timing of the organizational meeting and the fact that Garden State's original version of its motivation lacked credibility once the meeting date was established together constitute substantial and specific evidence of Garden State's intent to obtain a settlement.
 
 B. Lack of Candor
 
 33
 As an independent basis for disqualifying Garden State's application, both the FCC and the ALJ found that Garden State deliberately withheld evidence establishing the date of the April 30th organizational meeting. FCC regulations provide that "each applicant is responsible for the continuing accuracy and completeness of information furnished in a pending application or in Commission proceedings involving a pending application." 47 C.F.R. § 1.65(a). Thus, in considering licensing applications, the FCC "is not expected to play procedural games with those who come before it in order to ascertain the truth." RKO General, Inc. v. FCC, 670 F.2d 215, 229 (D.C.Cir.1981). Although not every failure to provide complete information subjects an applicant to disqualification, concealment of information, evasion of FCC requirements or other deliberate failures to produce information can result in disqualification for lack of candor. Fox River Broadcasting, Inc., 93 F.C.C.2d 127, 129 (1983).
 
 
 34
 Substantial evidence in the record supports the conclusion that Garden State deliberately withheld information that would have established when the organizational meeting occurred. Almost one year before the original hearing, WWOR filed a document production request seeking "all documents relating to the formation and operation of Garden State, including ... all documents relating to or reflecting any meetings, contacts, or communications among Garden State's principals." J.A. at 760. The request expressly asked for documents in the possession of Garden State's counsel. Id. at 750. In response, Garden State should have produced both Cohen's credit card receipt and airline ticket as well as Fetner's credit card receipt.
 
 
 35
 Garden State acknowledges that it failed to produce the critical documentation but it claims that its failure was inadvertent. It maintains that it did not realize the document request extended to Cohen's personal travel records in the law firm's files. In view of the active role Cohen played in the Mainstream proceedings and in the formation of Garden State, Garden State's explanation is dubious. It becomes even more suspect in light of the fact that the document production request expressly asked for documents in Cohen & Berfield's possession. Even assuming, however, that Garden State mistakenly believed that the document request did not extend to Cohen, it had to have known that the request included Fetner, a limited partner. Fetner's records, not Cohen's, contained the credit card receipt from the restaurant where the dinner meeting was held.
 
 
 36
 Garden State also maintains that it did not produce the information because it was not aware that the FCC attached any significance to it. Initially, that may have been true. Credit card receipts and an airline ticket would ordinarily provide no insight into the substance of the meeting among Cohen, Fetner and Wells. Nonetheless, as licensing proceedings continued, it became clear that the date of the meeting was critical to the resolution of the abuse of process issue. At the initial hearing, Cohen testified that he examined his diary for the date of that meeting "because I thought I should be able to tell you. It seemed to me you'd want to know the dates and I wanted to be able to give them to you." J.A. at 496. After the hearing, the Commission's Mass Media Bureau submitted proposed findings to the ALJ in which it expressed concern about the absence of proof of the date of the meeting. The Bureau argued that "the credibility of Wells' claim is directly related to the extent she had an opportunity to evaluate that programming. Equally significant is the fact that evidence establishing the date has not been produced by Garden State." J.A. at 1057.
 
 
 37
 [302 U.S.App.D.C. 128] Instead of producing evidence, Garden State responded to the Mass Media Bureau's concern by characterizing it as a "quibble." J.A. at 1078. Even after the ALJ issued his initial decision calling the date of the meeting "a material circumstance that is troubling in not being resolved with the precision of clear and convincing evidence," WWOR-TV, Inc., 6 F.C.C.R. 131, 139 (1991) (J.A. at 50), Garden State produced no evidence fixing the date of the meeting. Only after the FCC remanded the case to the ALJ with specific instructions to determine the date of the meeting did Garden State come forward with the credit card receipts and airline ticket.
 
 
 38
 These events support three conclusions. First, the date of the meeting undermined Wells's testimony that programming concerns motivated the formation of Garden State. Had the meeting occurred in July, Wells's testimony would have been more credible. Therefore, Garden State had reason to withhold evidence that established the real date of the meeting. Second, taken together, 47 C.F.R. § 1.65[9] and MCA's document production request required Garden State to produce the evidence it had regarding the meeting. Third, in light of Cohen's admission regarding the significance of the date, the Mass Media Bureau's claims and the ALJ's initial opinion, Garden State knew the issue was of paramount importance yet it did not make any effort to produce the information until the FCC forced it to do so. We have no difficulty in concluding that substantial evidence supports the FCC's conclusion that Garden State exhibited an egregious lack of candor.[10]
 
 C. Mootness
 
 39
 In its second appeal, Garden State challenges the FCC's approval of the transfer of Channel 9's license from MCA to Pinelands. Garden State argues that the FCC improperly allowed Pinelands to submit Form 316--the FCC's short form application--when it sought the license. Because Garden State's competing application for Channel 9 was disqualified on an abuse of process ground, the FCC claims that Garden State lacks standing to pursue the appeal. We agree with the FCC's reasoning but, because Garden State appealed before the FCC disqualified its application, we uphold the Commission on the ground of mootness rather than standing.
 
 
 40
 Mootness and standing are related concepts. The Supreme Court has characterized mootness as "the doctrine of standing set in a time frame: The requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness)." United States Parole Comm'n v. Geraghty, 445 U.S. 388, 397, 100 S.Ct. 1202, 1209, 63 L.Ed.2d 479 (1980) (internal quotation omitted). Just as a party must show a legally cognizable injury to have standing to begin a lawsuit, it must also show the continued existence of injury to maintain it. See Center for Science in the Pub. Interest v. Regan, 727 F.2d 1161, 1165 (D.C.Cir.1984). Thus, Garden State must "have suffered some actual injury that can be redressed by a favorable judicial decision." Iron Arrow Honor Soc. v. Heckler, 464 U.S. 67, 70, 104 S.Ct. 373, 374, 78 L.Ed.2d 58 (1983).
 
 
 41
 After filing its appeal, Garden State was disqualified for its abuse of process and lack of candor. The disqualification resulted not from the transfer proceeding Garden State now challenges but from the separate original proceeding on Garden State's application. More significantly, disqualification for abuse of process prevents an applicant from reapplying for the same station. See Public Serv. Television, Inc. v. FCC, 317 F.2d 900, 901 (D.C.Cir.1962). Garden State's appeal now [302 U.S.App.D.C. 129] presents no redressable injury. Even if the transfer to Pinelands were undone, Garden State's application would not be reinstated. Accordingly, this appeal is moot.
 
 D. Lack of Standing
 
 42
 In its third appeal, taken after the FCC disqualified it, Garden State objects to the FCC's subsequent approval of Pinelands' transfer of Channel 9 to BHC. Garden State alleges that Pinelands violated FCC rules by misrepresenting the extent of Gabelli's holdings in other media interests and by failing to report those interests in a timely manner. In addition, it maintains that the FCC erred in failing to hold a hearing on Gabelli's interests and by declining to postpone approval of the transfer until final judicial review of Garden State's application for Channel 9. Again, the FCC maintains that Garden State lacks standing to challenge the BHC transfer. Because we agree with the FCC that Garden State does not have standing to challenge this transfer, we do not reach the issue of the correctness of the Commission's approval.
 
 
 43
 Section 402 of the Act authorizes any person who is "aggrieved or whose interests are adversely affected by any order of the Commission granting or denying" a licensing application to appeal to this court. 47 U.S.C. § 402(b)(6). Because Garden State cannot demonstrate that it has suffered any injury resulting from the FCC's transfer approval, we conclude that Garden State was neither "aggrieved" nor "adversely affected" by the Commission's action.[11]
 
 
 44
 Whether a disqualified license applicant has standing to challenge the FCC's ultimate award of the license turns "in part on the seriousness and curability" of the disqualification. Coalition for Preservation of Hispanic Broadcasting v. FCC, 931 F.2d 73, 78 (D.C.Cir.1991) (en banc). Here, as discussed earlier with respect to its second appeal, any injury to Garden State stems from the FCC's findings of abuse of process and lack of candor, not from the subsequent transfers of Channel 9. Those findings are both serious and non-curable. Regardless of the merits of the transfer to BHC, Garden State cannot reapply for Channel 9. Thus, Garden State lacks standing to challenge this transfer.
 
 
 45
 Our holding in Orange Park Florida TV, Inc. v. FCC, 811 F.2d 664 (D.C.Cir.1987) provides support for our result here. In Orange Park, the Commission was faced with two competing applications for the construction of a television station. It disqualified Orange Park's application because Orange Park proposed locating its broadcasting antenna too close to other antennas. Id. at 667. When the Commission granted the license to Orange Park's competitor, Orange Park challenged the action in court. Id. at 668. We concluded that Orange Park had standing because the grant to Orange Park's competitor denied Orange Park the opportunity to reapply for the license. "But for that award, it would still be open season for Orange Park in an effort to secure rights to channel 25." Id. at 672. Thus, we found that "Orange Park has specified a concrete, economic interest that has been perceptibly damaged by the Commission's award." Id. at 673. Garden State has no such interest. Its disqualification cannot be cured; it cannot reapply for Channel 9. Any decision we might reach regarding the merits of the FCC's transfer approval would have no effect on Garden State at all. In short, unlike Orange Park, Garden State has not been injured by the FCC's approval.
 
 
 46
 Garden State asserts, however, that our decision in Jacksonville Broadcasting Corp. v. FCC, 348 F.2d 75 (D.C.Cir.1965) conflicts with the standing criteria established in Orange Park and leads to an opposite result here. In Jacksonville Broadcasting, we held that an applicant who was disqualified for ex parte contacts with the FCC had standing to challenge the FCC's disqualification proceedings and simultaneous award of the license to another applicant. Jacksonville Broadcasting, 348 F.2d at 79. The disqualified applicant argued that the entire proceeding was deficient because the FCC had applied different disqualification standards to it and to the successful applicant. Id. A finding that the Commission had employed a double standard in the proceeding would have required [302 U.S.App.D.C. 130] us to overturnboth the unsuccessful applicant's disqualification and the award of the license to the other applicant. Thus, in Jacksonville Broadcasting, a ruling in favor of the disqualified applicant necessarily would have provided that applicant with an opportunity to cure its deficiencies and perhaps to secure the license.
 
 
 47
 The same cannot be said of Garden State. Garden State's disqualification is not related to the subsequent, independent proceeding in which the Commission approved the transfer to BHC. If we were to rule that the FCC erred in granting the transfers, Garden State would remain disqualified from participating in the application process. Unlike the applicants in Jacksonville Broadcasting, Garden State's success on the merits of the transfer would not change its disqualified status.
 
 E. Rule 38 Sanctions
 
 48
 Garden State's appeal of its disqualification is frivolous. Less than four weeks after Mainstream withdrew its application and received a $5.3 million settlement, principals of Mainstream formed Garden State to reapply for Channel 9. Then, in response to FCC inquiries, Garden State's promoters misled the Commission about the timing of and motivation for Garden State's formation. Despite the overwhelming evidence against it, Garden State now asks us to hold that the FCC lacked substantial evidence to disqualify its application. In so doing, Garden State has "required members of this court and its staff to expend a good deal of time and attention which could have been used elsewhere." United States v. Stillwell, 810 F.2d 135, 136 (7th Cir.1987).
 
 
 49
 Federal Rule of Appellate Procedure 39(b) states in general that "costs shall not be awarded for or against the United States." Rule 38, however, allows us to award "just damages and single or double costs to the appellee" if we determine that an appeal is frivolous. "Thus, the fact that the FCC would be ineligible for an award of costs in its favor [under Rule 39(b) ] does not bar this court from imposing, pursuant to Rule 38, 'just damages' 'as a penalty.' " South Star Communications, Inc. v. FCC, 949 F.2d 450, 452 (D.C.Cir.1991).
 
 
 50
 It is immaterial that the FCC has not requested sanctions. Nor are we required to grant the parties a hearing before we impose them. "Where, as in this and most Rule 38 cases, the conduct that is sought to be sanctioned consists of making objectively groundless legal arguments in briefs filed in this court, there are no issues that a hearing could illuminate." Hill v. Norfolk & W. Ry., 814 F.2d 1192, 1201 (7th Cir.1987). Accordingly, pursuant to Rule 38, we now assess costs against Garden State equal to the FCC's costs, including attorney's fees, made in connection with Garden State's three appeals. We direct the Commission to submit its expenditures with supporting affidavits to the Court within ten days of the date this opinion issues. Garden State has ten days from receipt of the FCC's submission to respond.
 
 III.
 
 51
 The FCC's decision to disqualify Garden State's application for abuse of process and lack of candor is supported by substantial evidence. Garden State filed just weeks after its principals received a lucrative payoff from the Mainstream settlement. It claimed it sought Channel 9 because of programming concerns, but Wells, Fetner and Cohen met to form Garden State before WWOR had a real opportunity to operate the station. Moreover, Garden State's principals repeatedly evaded inquiries regarding the timing of the organizational meeting, seeking through their testimony to obfuscate the issue. Despite its awareness of the FCC's concerns and despite its continuing obligation to produce material evidence, Garden State did not come forward with any evidence of the date of the organizational meeting until the Commission forced it to do so. Given these facts, we think the FCC had no choice but to disqualify Garden State for abuse of process and lack of candor.
 
 
 52
 Likewise, we conclude that Garden State's second appeal challenging Channel 9's transfer to Pinelands is moot and we uphold the FCC's decision that Garden State lacks standing to bring its third appeal challenging the subsequent transfer to BHC. Any injury [302 U.S.App.D.C. 131] Garden State has suffered flows from its disqualification, not from the transfers. Accordingly, we dismiss Garden State's second and third appeals. Finally, because we conclude that Garden State's appeals in these cases are frivolous, we assess costs against Garden State pursuant to Federal Rule of Appellate Procedure 38.
 
 
 53
 It is so ordered.
 
 
 
 [1]
 We have determined sua sponte to consolidate the three appeals. Fed.R.App.P. 3(b). A fourth appeal, filed by Whitely Communications, was originally consolidated with one of Garden State's appeals. Whitely, however, made no filings after it docketed its appeal. We therefore dismiss Whitely's appeal for failure to prosecute. See D.C.Cir. Rule 23; see also Barber v. American Sec. Bank, 841 F.2d 1159, 1161 (D.C.Cir.1988) (appeal dismissed for failure to timely file brief or motion to enlarge time for filing)
 
 
 [2]
 At the time, Channel 9 was operated by RKO General, Inc. (RKO)
 
 
 [3]
 Wells originally asserted that the first conversation she had with Cohen before the organizational meeting occurred "sometime in the summer." J.A. at 546. When asked why she thought it occurred in the summer, Wells replied, "[F]or one thing, if it was April 15th, MCA had just taken the station over and they would barely have had time to make any changes at all." Id
 
 
 [4]
 Cohen testified that Fetner said he "wanted to do things that gave him excitement and that were different and unique and where he had fun and that only a television station, his buying a television station, to him, wasn't what he was looking for." J.A. at 484. Cohen also stated that Fetner liked "the challenge and the chase." Id
 
 
 [5]
 Ownership of a broadcast license by "any corporation organized under the laws of any foreign government" is prohibited. 47 U.S.C. § 310(b)
 
 
 [6]
 By that time, Gabelli had increased his ownership in Pinelands to 13.62 per cent
 
 
 [7]
 On June 12, 1992, Pinelands and BHC jointly informed the FCC that Gabelli owned interests in twenty-seven television stations, eleven daily newspapers and at least one cable television system
 
 
 [8]
 Cohen also testified, however, that Fetner "was not interested in settling this Garden State case" and that "he was interested in the quest, and he wasn't interested in a settlement." J.A. at 483
 
 
 [9]
 Section 1.65 provides that "[e]ach applicant is responsible for the continuing accuracy and completeness of information furnished in a pending application or in Commission proceedings involving a pending application." 47 C.F.R. § 1.65(a)
 
 
 [10]
 In its first appeal, Garden State also argues that the Commission committed other reversible error. First, the FCC denied Garden State a full hearing comparing its qualifications to those of WWOR. Because the FCC disqualified Garden State for abuse of process, a full comparative hearing would have been a waste of time. Second, Garden State claims the FCC should have added abuse of process issues against WWOR for a variety of reasons. None of these claims has merit
 
 
 [11]
 In deciding that Garden State lacks standing under section 402, we do not reach the parties' arguments regarding Garden State's standing under the Constitution