Sean **BREEN, as administrator of the estate of Christopher Breen, John E. Breen and Marian K. Breen, Plaintiffs,**

v.

**TEXAS A & M UNIVERSITY, et al., Defendants.**

No. Civ.A. G–01–670.

United States District Court, S.D. Texas, Galveston Division.

July 23, 2002.

Steven K. DeWolf, Bellinger & DeWolf, Dallas, TX, for plaintiffs.

James C. Todd, Office of Attorney General, Austin, TX, for defendants.

### ORDER DISMISSING PLAINTIFFS' FEDERAL LAW CLAIMS WITH PREJUDICE AND DISMISSING PLAINTIFFS' STATE LAW CLAIMS WITHOUT PREJUDICE

KENT, District Judge.

The Texas A & M Bonfire ("Bonfire") tragically collapsed in the early hours of November 18, 1999, killing twelve students and injuring an additional twenty-seven. This action is one of six virtually identical lawsuits [1] now pending before the Court wherein the Plaintiffs allege that Texas A & M University ("the University") and

1. The Court is issuing this Order in all six lawsuits, which are styled as *Breen v. Tex. A &* *M Univ., et al.*, No. G–01–CV–670 (S.D.Tex.

various former and present high-level University employees [2] ("University Officials") violated 42 U.S.C. § 1983 when they deprived the Bonfire victims of their Fourteenth Amendment right to substantive due process by acting with deliberate indifference to the state created danger that killed or injured them. Plaintiffs further allege that Defendants negligently harmed the victims in violation of Texas state law.[3] On May 24, 2002, Defendants filed a Motion for Summary Judgment wherein they assert that they are immune from liability with respect to Plaintiffs' federal and state law claims and alternatively, that Plaintiffs have failed to state a viable cause of action upon which relief can be granted.[4] After very carefully and thoughtfully considering Defendants' well-prepared Motion, Plaintiffs' insightful Responses thereto, the lengthy record in this matter and the applicable law, the Court concludes that Defendants' Motion for Summary Judgment must be **GRANTED IN PART** with respect to Plaintiffs' federal law claims. For reasons set forth below, the Court need not reach the merits of Defendants' Motion for Summary Judgment with respect to Plaintiffs' allegations of negligence, as the Court respectfully declines to exercise supplemental jurisdiction over Plaintiffs' state law claims.[5]

---

[2] filed Oct. 24, 2001); *Comstock v. Tex. A & M Univ., et al.*, No. G–01–CV–730 (S.D.Tex. filed Nov. 19, 2001); *Davis v. Tex. A & M Univ., et al.*, No. G–01–CV–720 (S.D.Tex. filed Nov. 16, 2001); *Kimmel v. Tex. A & M Univ., et al.*, No. G–01–CV–719 (S.D.Tex. filed Nov. 16, 2001); *Scanlan v. Tex. A & M Univ., et al.*, No. G–01–CV–733 (S.D.Tex. filed Nov. 19, 2001); and *Self, et al. v. Tex. A & M Univ., et al.*, No. G–01–CV–721 (S.D.Tex. filed Nov. 16, 2001). The Plaintiffs are, in *Breen*, the brother/administrator and parents of Christopher Breen, a former student killed in the collapse; in *Comstock*, John Andrew Comstock, the most severely injured surviving victim of the collapse, and his mother; in *Davis*, Bill Davis, one of the students injured in the collapse; in *Kimmel*, the estate and parents of Lucas Kimmel, one of the students killed in the collapse; in *Scanlan*, Lauren Scanlan, one of the students injured in the collapse, and her parents; and in *Self*, the mother/administrator of Jerry Don Self (student killed), the mother/administrator and father of Bryan McClain (student killed); the father/administrator and mother of Christopher Lee Heard (student killed), the father/administrator and mother of Chad Powell (student killed), Matthew Robbins (student injured), Dominic Braus (student injured) and his mother. In all, these six suits represent eleven (six killed, five injured) of the thirty-nine total victims of the Bonfire collapse.

2. The University Officials include: Russell Thompson; Dr. J. Malon Southerland; Dr. William Kibler; Dr. John J Koldus, III; Dr. Ray M. Bowen; Dr. Kevin Jackson; Dr. Zack Coapland; Maj. Gen. M.T. Hopgood; Brig. Gen. Don Johnson; Maj. Rebecca Ray; Jim Reynolds; Robert Harry Stiteler; and Michael Krenz. Only Thompson, Bowen and Southerland are named as Defendants in all six suits. The remaining individuals are named as Defendants in *Self* only, or *Self* and *Comstock*. The Court will hereinafter refer to the University and the University Officials together as "Defendants."

3. The *Self* and *Comstock* Plaintiffs have also asserted state law claims against a number of Defendants who, although intimately involved with the University, were not employed by the University at the time of the Bonfire collapse. The analysis in Part II and Part III of this Order pertains only to the merits of Plaintiffs' claims against the University and the University Officials; and in no way comments upon the validity of any Bonfire-related claim, filed by any Plaintiff, against any non-state actor Defendant.

4. Defendants' Motion for Summary Judgment incorporates the legal arguments and authorities contained within their Rule 12(b)(6) Motion to Dismiss, filed December 19, 2001.

5. Several of the Plaintiffs are not asserting state law claims in the instant lawsuits, as they have already filed such claims in various state courts. Part IV of this Order, which pertains to the Court's supplemental jurisdiction, is therefore inapplicable to those Plaintiffs.

## I.

The following facts are primarily derived from the Final Report of the Special Commission on the 1999 Texas A & M Bonfire ("Final Report"). At this stage of the proceedings, the Parties have accepted the Final Report—the product of hundreds of hours of investigation and expert analysis—as an authoritative account of the history of Bonfire, the mechanics of the 1999 collapse and the factors that contributed to this far-reaching tragedy. The Court likewise adopts the Final Report as a definitive narrative of the relevant facts for purposes of its instant analysis. However, because the Court wishes to provide as comprehensive of a factual summary as possible, the following account also includes several facts gleaned from the summary judgment evidence.

The much loved and revered Texas A & M Bonfire tradition began humbly, with a burning trash heap in 1909. Over the ensuing ninety years, Bonfire grew into one of the most cherished traditions of Texas A & M University, uniting students, administrators, alumni and the surrounding community each September, October and November. The process of cutting trees into logs, stacking the logs into a towering structure and preparing to ceremoniously burn the edifice on the eve of Texas A & M's annual football game with the University of Texas occupied over five thousand students for an estimated 125,000 hours each fall. At the culmination of these efforts, an estimated forty to eighty thousand individuals gathered annually to watch Bonfire ignite and burn. The University's students, or "Aggies," believe that Bonfire symbolizes their burning desire to "beat the hell out of t.u" at the next day's football game. It is symbolic not only of one school deeply rooted in tradition, but is representative of the entire Nation's passionate fascination with the most venerated aspects of collegiate football.

Bonfire may have started out as a pile of wood and trash, but by 1999, it had evolved into a massive structure with measurable technical complexity. The initial switch from trash to logs took place in the 1940s, when the students introduced a center pole and a teepee-shaped design. Because a teepee-shaped structure can only reach as high as its tallest log, the students began building Bonfire with multiple layers of logs in the 1960s. The 1968 and 1969 Bonfires utilized this multi-tier design, with the 1969 Bonfire reaching 109 feet—the tallest Bonfire ever recorded. In the late 1970s, Bonfire began to take on a wedding cake-shaped design, with multiple cylindrical layers stacked one on top of the other. Since the 1980s, all Bonfires have been (1) built in the wedding cake design; (2) sixty to eighty feet tall; (3) six tiers bound with wire; (4) built around a two-part spliced center pole; and (5) surrounded by four perimeter poles with guy ropes. A completed 1990s Bonfire likely weighed over two million pounds. No other institution of higher learning in the world lays claim to a blazing bonfire of such monumental proportions, and it is an instantly recognizable source of pride and "fighting spirit" to past, present and future Aggies around the globe.

Even in light of Bonfire's massive proportions, its design and construction always remained almost the exclusive purview of the students. The "Redpots," student leaders between the ages of 19 and 21, controlled the Bonfire build year after year. The Redpots were not licensed engineers or architects, lacked formalized construction training and were not required to attend classes on architectural design or building techniques. Moreover, Redpots possessed less than two months experience as "Junior Redpots" before being promoted to Redpots as seniors, failed to utilize blueprints and relied on building techniques that were passed down orally from their student

predecessors. Yet Defendants entrusted the Redpots with the primary responsibility for erecting the enormous Bonfire each fall.

Defendants undoubtedly recognized the dangers of Bonfire. In fact, one University document noted that "[i]t is a well-established fact that Bonfire constitutes by far the single most liability laden student activity on campus." Other University documents warned that "Bonfire is, by its vary nature, a hazardous activity"; "Bonfire involves thousands of students engaged in a variety of activities, some of which involve potential risks and liability and therefore supervision is paramount"; and "[a]s we all are aware, Bonfire is a very risky undertaking from a safety and liability perspective." Blaine Lewis, a Junior Redpot, wrote in a 1997 paper that stacking the Bonfire's logs "has the potential for great tragedy at any time." Against this backdrop, the University purchased a two million dollar general liability insurance policy to insure against a catastrophic disaster on campus.

Nevertheless, very few truly significant restrictions were ever imposed, communicated or uniformly enforced to protect the safety of Bonfire participants. However, Defendants did not ignore Bonfire safety altogether. Faculty and staff frequently visited the Bonfire site for observation purposes. Defendants created the faculty post of "Bonfire Advisor," implemented a policy that restricted access to the Bonfire site during construction and intermittently passed other safety measures in response to particular "trigger" events. For instance, Defendants (1) imposed a fifty-five foot height restriction on Bonfire in response to fire hazard complaints; (2) required Bonfire participants to attend tree-cutting training programs after they received reports of cut-site accidents; (3) appointed an alcohol awareness committee and organized the "Don't Shatter the Tra-dition" campaign to combat excessive Bonfire-related drinking; and (4) prohibited students from riding in the back of pick-up trucks after a motor vehicle fatality. The Final Report characterizes this conduct as a "reactive risk management model" and explains that Defendants only implemented very specific remedial measure in response to specific triggers. Apparently, no specific events or incidents triggered Defendants to query whether Bonfire was structurally unsound prior to 1999. Consequently, they never inquired into Bonfire's structural integrity; and therefore neglected to reexamine Bonfire's design prior to the collapse.

It can be reasonably argued that Defendants *should* have undertaken a study of Bonfire's structural soundness in 1994. That year, the partly constructed edifice suffered a partial collapse (or "lean") that should have alerted the State Defendants of Bonfire's instability. However, the 1994 mishap was attributed by those involved to wet and unstable ground, not structural integrity. In fact, those involved praised the structural integrity of the 1994 Bonfire because heavy equipment was needed to pull the stack apart. Consequently, the mishap failed to trigger a design re-examination. According to the Final Report, the "people obviously concerned with Bonfire safety, did in fact misinterpret these events and missed clear warning signs about structural integrity. This tunnel vision in decision [was] due ... to a cultural bias in which legitimate courses of action outside past experience or contrary to the University's pre-disposition are often not considered.... More objective interpretations or more conservative interpretations, which might have led to a structural reassessment, could reasonably have been considered."

Regrettably, because of Defendants' reluctance to depart from or question "the way its always been," no one viewed the

1999 Bonfire as a potentially hazardous towering structure tenuously held together with wire. More significantly, no one proposed a sweeping reassessment of Bonfire's construction process. And the results were catastrophic and heartbreaking. The 1999 Bonfire collapsed prior to completion, killing twelve students and injuring twenty-seven others, resulting in an enormous groundswell of grief and remorse which continues to reverberate to the deepest recesses of the worldwide Aggie community.

The Final Report characterizes the physical mechanics of the collapse as a "containment failure" in the first tier of logs, primarily caused by (1) excessive internal stresses driven primarily by aggressive wedging of second tier logs into the first tier; and (2) inadequate containment strength caused by insufficient binding support in the wiring used to tie the logs together. Moreover, the first stack of the 1999 Bonfire was not wrapped with steel cables, further reducing containment strength. Steel cables had been wrapped around the first tier as a matter of course for several years prior to 1999. The Final Report also identifies the overarching factors that brought about the physical collapse: the absence of a proactive risk management model; the University community's cultural bias impeding risk identification; the lack of student leadership knowledge and skills pertaining to structural integrity; and the lack of formal, written Bonfire design plans or construction methodology. Together, these factors created an environment wherein students were permitted to construct a complex and dangerous structure without adequate engineering supervision or physical safety controls and led to a complex organizational failure. The Bonfire collapse was not caused by a specific event, error or omission in 1999, but, rather, by decisions and actions taken by both students and University officials over many, many years.

## II.

The Court will initially consider Plaintiffs' § 1983 claims against the University, before turning to Plaintiffs' claims against the University Officials. In their Motion for Summary Judgment, Defendants maintain that the University is entitled to summary judgment in its favor on the basis of Eleventh Amendment immunity. The Court agrees.

 The University is a state-funded state institution of higher education. *See* Tex.Educ.Code § 86.02 (signifying that Texas A & M University was created by the laws of the State of Texas). Consequently, Plaintiffs are barred from bringing this suit against the University unless they are able to overcome the State's jurisdictional immunity in federal court, commonly referred to as "Eleventh Amendment" immunity.[6] *See Quern v. Jordan,* 440 U.S. 332, 341, 99 S.Ct. 1139, 1145, 59 L.Ed.2d 358 (1979). Eleventh Amendment immunity prohibits actions against a state entity in federal court, unless either the state has waived its sovereign immunity or Congress, pursuant to another provision in the Constitution, has expressly abrogated the state's immunity. *See Will v. Mich. Dept. of State Police,* 491 U.S. 58, 66, 109 S.Ct. 2304, 2309–10, 105 L.Ed.2d 45 (1989); *Welch v. Tex. Dept. of Highways and Pub. Transp.,* 483 U.S. 468, 473–74, 107 S.Ct. 2941, 2946, 97 L.Ed.2d 389 (1987). A

**6.** The Court notes that "Eleventh Amendment" immunity is not actually derived from the Eleventh Amendment to the Constitution. *See Alden v. Maine,* 527 U.S. 706, 713, 119 S.Ct. 2240, 2246, 144 L.Ed.2d 636 (1999) (explaining that the phrase "Eleventh Amendment immunity" is "convenient shorthand but something of a misnomer, for the sovereign immunity of the States neither derives from, nor is limited by, the terms of the Eleventh Amendment.").

state's intention to waive its sovereign immunity must be "unequivocally expressed." *Stem v. Ahearn,* 908 F.2d 1, 4 (5th Cir. 1990) (citing *Port Authority Trans–Hudson Corp. v. Feeney,* 495 U.S. 299, 305–06, 110 S.Ct. 1868, 1873, 109 L.Ed.2d 264 (1990)). Significantly, Texas has not consented to be sued in federal court by individuals regarding the 1999 Bonfire collapse, nor has state sovereign immunity been abrogated or compromised by Congress with the passage of § 1983. The Supreme Court has held, in fact, that states are not "persons" subject to suit within § 1983's scope. *See Arizonans for Official English v. Ariz.,* 520 U.S. 43, 69, 117 S.Ct. 1055, 1069, 137 L.Ed.2d 170 (1997) (citing *Will,* 491 U.S. at 71, 109 S.Ct. at 2312); *see also Cronen v. Tex. Dept. of Human Servs.,* 977 F.2d 934, 936 (5th Cir.1992); *Stem,* 908 F.2d at 4. Accordingly, the Court finds that the University is shielded from liability in this matter by its Eleventh Amendment immunity, as a matter of law.[7] Consequently, Defendants' Motion for Summary Judgment is hereby **GRANTED** with respect to Plaintiffs' federal law claims against the University and each and all of those claims are hereby **DISMISSED WITH PREJUDICE.**

### III.

Plaintiffs also allege that the University Officials are liable for the harm that befell the Bonfire victims pursuant to § 1983.[8] In response, Defendants contend that Plaintiffs' § 1983 claim against the University Officials must be dismissed pursuant to Fed.R.Civ.P. 12(b)(6), or, alternatively, on qualified immunity grounds. The Court need not reach the qualified immunity issue, however, because Defendants correctly assert that a Rule 12(b)(6) dismissal is warranted.

*Legal Standard for Rule 12(b)(6) Dismissal*

The Federal Rules of Civil Procedure authorize a court, upon suitable showing, to dismiss any action or any claim within an action for failure to state a claim upon which relief can be granted. *See* Fed.R.Civ.P. 12(b)(6). Put another way, Rule 12(b)(6) dismissal is appropriate when the "the plaintiff would not be entitled to relief under any set of facts or any possible theory that he could prove consistent with the allegations in his complaint." *Jones v. Greninger,* 188 F.3d 322, 324 (5th Cir. 1999); *see also* Fed.R.Civ.P. 12(b)(6). When making this determination, the Court accepts as true all well-pleaded allegations in the complaint, and views them in a light most favorable to the plaintiff. *See Malina v. Gonzales,* 994 F.2d 1121, 1125 (5th Cir.1993). A plaintiff must plead specific facts in order to avoid dismissal for failure to state a claim and consequent-

---

7. Previous decisions of the Fifth Circuit and District Courts within the Southern District of Texas have consistently afforded Eleventh Amendment immunity to state universities, including Texas A & M. *See, e.g., Tex. ex rel. Bd. of Regents of Univ. of Tex. Sys. v. Walker,* 142 F.3d 813, 820 n. 10 (5th Cir.1998) (citing *Regents of Univ. of Cal. v. Doe,* 519 U.S. 425, 429–31, 117 S.Ct. 900, 903–04, 137 L.Ed.2d 55 (1997) and *United Carolina Bank v. Bd. of Regents of Stephen F. Austin State Univ.,* 665 F.2d 553, 556–61 (5th Cir.1982)); *Mangaroo v. Nelson,* 864 F.2d 1202, 1204 (5th Cir.1989); *Gay Student Servs. v. Tex. A & M Univ.,* 737 F.2d 1317, 1333–334 (5th Cir.1984); *Lowery v. Univ. of Houston—Clear Lake,* 82 F.Supp.2d 689, 693 (S.D.Tex.2000); *Chacko v. Tex. A & M Univ.,* 960 F.Supp. 1180, 1197–198 (S.D.Tex.1997); *Baldwin v. Univ. of Tex. Med. Branch at Galveston,* 945 F.Supp. 1022, 1030 (S.D.Tex.1996); *Idoux v. Lamar Univ. Sys.,* 817 F.Supp. 637, 639–640 (E.D.Tex.1993); *Zentgraf v. Tex. A & M Univ.,* 492 F.Supp. 265, 271–72 (S.D.Tex.1980).

8. Plaintiffs have sued the University Officials in their individual capacities only.

ly, the Court will not accept conclusory allegations or unwarranted deductions of fact contained within the plaintiff's complaint as true. *See Tuchman v. DSC Communications Corp.*, 14 F.3d 1061, 1067 (5th Cir.1994). Unlike a Motion for Summary Judgment, a Motion to Dismiss should be granted only when it appears without a doubt that the plaintiff can prove no set of facts in support of his claims that would entitle him to relief. *See Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957).

In considering a motion to dismiss for failure to state a claim, a district court must limit itself to the contents of the pleadings, including attachments thereto. *See* Fed.R.Civ.P. 12(b)(6). However, "[d]ocuments that a defendant attaches to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to [the plaintiff's] claims." *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498–99 (5th Cir.2000) (citing *Venture Assoc. Corp. v. Zenith Data Sys. Corp.*, 987 F.2d 429, 431 (7th Cir.1993)); *see also Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir.2002); *Branch v. Tunnell*, 14 F.3d 449, 453–54 (9th Cir.1994); *In re Securities Litigation BMC Software, Inc.*, 183 F.Supp.2d 860, 883 (S.D.Tex.2001); *Franks v. Prudential Health Care Plan, Inc.*, 164 F.Supp.2d 865, 872 (S.D.Tex. 2001). By attaching documents that are integral to the plaintiff's claims, "the defendant merely assists the plaintiff in es-

tablishing the basis of the suit, and the court in making the elementary determination of whether a claim has been stated." *Collins*, 224 F.3d at 499. In these cases, the Complaints on file repeatedly refer to the Final Report; and Plaintiffs' allegations are clearly based upon the findings contained therein. Accordingly, in reviewing Plaintiffs' federal claims under Rule 12(b)(6), the Court will equally consider the Plaintiffs' well-pleaded allegations and the facts set out in the Final Report.

*42 U.S.C. § 1983*

█ Section 1983 provides a cause of action against "[e]very person who, under color of any statute ... of any State ... subjects, or causes to be subjected, any citizen ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws...." 42 U.S.C. § 1983; *see also Moore v. Willis Indep. Sch. Dist.*, 233 F.3d 871, 874 (5th Cir.2000) (citing *Leffall v. Dallas Indep. Sch. Dist.*, 28 F.3d 521, 525 (5th Cir.1994)). "Rather than creating substantive rights, § 1983 simply provides a remedy for the rights that it designates." *Johnston v. Harris County Flood Control Dist.*, 869 F.2d 1565, 1573 (5th Cir.1989). The assertion of an underlying constitutional or statutory violation is therefore a predicate to liability under § 1983. *See id.* In their attempt to establish federal liability against the University Officials, Plaintiffs premise their § 1983 claims upon an alleged substantive due process violation, arising from the "state created danger" theory.[9]

9. Defendants initially argue that Plaintiffs' § 1983 claims must be dismissed because the state created danger theory was not well-settled law in this Circuit at the time of the Bonfire collapse. The Court rejects this argument, however because the Fifth Circuit's recent decision in *McClendon v. City of Columbia*, 258 F.3d 432 (5th Cir.2001), explains that the state created danger theory was the law in this Circuit well-before 1999. *See id.* at 441 ("We conclude that ... [on July 12, 1993] it

was clearly established that a state actor creating a danger, knowing of that danger, and using his authority to create an opportunity for a third person to commit a crime that otherwise might not have existed, was subject to liability for a violation of the victim's rights."). The fact that the Fifth Circuit recently agreed to rehear *McClendon en banc* does not change the Court's conclusion. *McClendon* is the best authority currently available on this issue and the Court sees no

*State Created Danger Theory*

In general, state governments are under no affirmative duty to provide protective services: "[T]he Due Process Clause generally confers no affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty or property interests of which the government itself may not deprive the individual ... [Thus,] a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." *DeShaney v. Winnebago County Dep't of Social Servs.*, 489 U.S. 189, 196–97, 109 S.Ct. 998, 1003–04, 103 L.Ed.2d 249 (1989); *see also McClendon v. City of Columbia*, 258 F.3d 432, 436 (5th Cir.2001); *Walton v. Alexander*, 44 F.3d 1297, 1302 (5th Cir.1995) (*en banc*). Rather, the Constitution imposes a duty on the state to protect particular individuals only in "certain limited circumstances." *DeShaney*, 489 U.S. at 198, 109 S.Ct. at 1004. The Fifth Circuit has recognized two such limited scenario, namely, when the state has a special relationship with the person or when the state exposes a person to a danger of its own creation, or a "state created danger." *See McClendon*, 258 F.3d at 436. Plaintiffs do not argue that the University Officials had a special relationship with the Bonfire victims, rather, they allege that the University Officials violated the Due Process Clause by failing to protect the victims from a state created danger.

■ The Fifth Circuit set out the two basic requirements of the state created danger theory in *Piotrowski v. City of Houston*, 51 F.3d 512 (5th Cir.1995). A plaintiff asserting such a claim must show the (1) the state actors increased the danger to him or her; and (2) the state actors acted with deliberate indifference. *See id.* at 515; *see also McClendon*, 258 F.3d at 437; *Doe v. Hillsboro Indep. Sch. Dist.*, 113 F.3d 1412, 1415 (5th Cir.1997); *Johnson v. Dallas Indep. Sch. Dist.*, 38 F.3d 198, 201 (5th Cir.1994). Plaintiffs allege that the University Officials created a danger by failing to ensure the Bonfire's structural integrity. The facts surrounding the Bonfire collapse clearly tend to suggest that the conduct of the University Officials may have contributed, at least in part, to the 1999 Bonfire collapse. But *even if* the University Officials created an environment that was dangerous to the Bonfire victims (and the Court is expressly not now so finding), it is quite clear that they did not do so with "deliberate indifference"—the requisite culpability to make out a constitutional violation.[10]

*Deliberate Indifference*

■ There is a significant distinction between a tort and a *constitutional* wrong.

reason to depart from its reasoning. On the assumption that this ruling will be appealed, the Parties are of course free to seek reassessment of the present state of the law. But any modification thereof is a policy consideration best left to the Fifth Circuit.

10. Furthermore, *even if* the University Officials did create an environment that was dangerous to the Bonfire victims, that fact appears to be insufficient to satisfy the first requirement for the state created danger theory. The Final Report concluded that the students who were building the 1999 Bonfire (a group which includes the students who were killed and/or harmed) also played a role in the harm that befell them. None of the Fifth Circuit cases recognizing the state created danger doctrine have involved an incident for which the victims were partially at fault. Rather, the relevant cases have only recognized state created dangers where state actors created situations that increased the risk of danger from *third parties* to specific individuals. *See, e.g. McClendon*, 258 F.3d at 432; *Piotrowski v. City of Houston*, 51 F.3d at 512; *Johnson*, 38 F.3d at 198. On this basis alone, the state created danger theory is legally inapplicable here.

*Leffall,* 28 F.3d at 532 (citing *de Jesus Benavides v. Santos,* 883 F.2d 385, 388 (5th Cir.1989)). The Supreme Court has made it clear that "[t]he Due Process Clause of the Fourteenth Amendment is not implicated by the lack of due care of an official causing unintended injury to life, liberty or property." *Davidson v. Cannon,* 474 U.S. 344, 347, 106 S.Ct. 668, 670, 88 L.Ed.2d 677 (1986). Rather, reckless or grossly negligent conduct by state officials falls squarely within the ambit of traditional state tort law. *See de Jesus Benavides,* 883 F.2d at 388. Simply put, where a government official is merely negligent in causing the injury, no procedure for compensation is *constitutionally* required. *See Davidson,* 474 U.S. at 347, 106 S.Ct. at 670. Accordingly, the conduct of a state actor fails to violate a victim's right to substantive due process unless that conduct is carried out with deliberate indifference.

The Fifth Circuit defines "deliberate indifference" as " 'a lesser form of intent' rather than a 'heightened form of negligence.' " *Leffall,* 28 F.3d at 531; *Doe v. Taylor Indep. Sch. Dist.,* 15 F.3d 443, 453 n. 13 (5th Cir.1994) (explaining that deliberate indifference involves a higher degree of certainty than gross negligence). To establish deliberate indifference, "the environment created by the state actors must be dangerous; they must know it is dangerous; and ... they must have used their authority to create an opportunity that would not otherwise have existed for the ... crime to occur." *Johnson,* 38 F.3d at 201. Deliberate indifference can arise from "tortious conduct exceeding mere negligence but not quite rising to the level of intentional, e.g. deliberate (or conscious) indifference, recklessness or gross negligence." *Salas v. Carpenter,* 980 F.2d 299, 307 (5th Cir.1992). Essentially, "[t]he key to the state created danger cases ... lies in the state actors' culpable knowledge and conduct in affirmatively placing an individual in a position of danger, effectively stripping a person of [his or] her ability to defend [himself or] herself, or cutting off potential sources of private aid." *Johnson,* 38 F.3d at 201 (quotations and citations omitted).

In *Johnson,* the Fifth Circuit noted that *Wood v. Ostrander,* 879 F.2d 583 (9th Cir. 1989), exemplifies the state created danger theory of liability. In that case, a police officer arrested a drunken driver and impounded his car, leaving the driver's female passenger alone at night, without any means of getting home, in an area notorious for criminal activity. She was subsequently raped by a stranger who offered her a ride. *See id.* at 586. Other cases applying the state created danger theory are to a similar effect. *See, e.g. Dwares v. City of New York,* 985 F.2d 94, 99 (2d Cir.1993) (holding that it would violate due process for police officers to conspire with and sanction violence by "skinheads" against persons burning American flags); *L.W. v. Grubbs,* 974 F.2d 119, 121–22 (9th Cir.1992) (holding that § 1983 plaintiff had stated a claim by alleging that she was a nurse employed by the state, that her supervisors had instructed her to work alone with a known sex offender after leading her to believe that she would not be made to work under such conditions and that she had been assaulted by the sex offender while alone with him); *Freeman v. Ferguson,* 911 F.2d 52 (8th Cir.1990) (finding a viable § 1983 claim where a woman was killed by her estranged husband after the chief of police had directed his officers to ignore her pleas that they stop the husband, who was the police chief's friend, from threatening and intimidating her); *White v. Rochford,* 592 F.2d 381, 382–83 (7th Cir.1979) (finding that two small children stated a § 1983 claim by alleging that police officers arrested their uncle and left them unattended in a car on the side of the freeway). In light of these authorities, the

Court emphasizes that deliberate indifference arises in cases involving conduct that is substantially more abhorrent, and significantly more detestable, than even gross negligence.

The conduct of the University Officials does not rise to such a level, as a matter of law. As demonstrated by the Final Report, there is *no* evidence that the University Officials were aware of the impending Bonfire collapse. To the contrary, the Final Report concluded that "[n]o one in the [University's] administration ever interpreted ongoing behavioral problems as indications that safe Bonfire design and construction was beyond the capabilities of student leaders." Nor do the facts suggest that the University Officials directly prevented increased Bonfire safety or opposed a review of Bonfire's structural integrity. They simply failed to recognize that change was desperately needed. They built Bonfire the way that it had always been built and the way that it had always succeeded. For them, Bonfire was, and is, an institution. And, as stated in the Final Report, "leaders do not change institutions unless there is a clearly perceived need to do so."

The record presently before the Court amply demonstrates that the University Officials were aware of the dangers posed by Bonfire. Consequently, it can be persuasively argued that they may have acted negligently, possibly even grossly so, and that the Bonfire collapse could have been prevented had cautionary measures been implemented. However, despite their knowledge of Bonfire's extremely risky nature and their failure to pro-actively avert or reduce those risks, the evidence equally shows that the University Officials were unaware of the *precise* risk at hand-the risk that the entire Bonfire would come tumbling down. Rather, the University Officials believed that ninety years of successful Bonfire building experience was enough in itself to ensure that the tradition would safely continue. Although the University Officials' lack of awareness might appear naive, and possibly even foolish, in retrospect, it cannot support a finding of deliberate indifference. This is not a case in which state actors "brought the victim into close proximity with a specific individual known to be likely to commit violence, ... or abandoned the victim in a highly dangerous environment, ... or conspired with [a] private actor who inflicted the deprivation." *Leffall*, 28 F.3d at 531. Plaintiffs concede that the University Officials took *some* measures to ensue Bonfire safety (i.e. height restriction, appointment of a Bonfire advisor, tree-cutting training program, alcohol awareness committee, prohibition against riding in the back of pick-up trucks). Simply put, because the University Officials were indeed concerned with Bonfire Safety (albeit, in hindsight, not concerned enough, or in precisely the right way), the Court cannot conclude that their conduct rose to the egregious level of a constitutional violation, as a matter of law.[11] *See id.* at 531–32 (concluding that even if school officials' decision to sponsor dance at high school, despite awareness of dangers posed thereby, was negligent, such conduct did not rise to the level of deliberate indifference to the rights of a student who was killed by random gunfire in the school parking lot after the dance); *Doe*, 15 F.3d at 456 n. 12 (observing that

---

**11.** The Court acknowledges that the existence of deliberate indifference is often a factual determination. However, because the Final Report affirmatively discloses that the University Officials in this case lacked the requisite culpability with respect to the alleged violation of the Bonfire victims' constitutional rights, it is not only appropriate, but mandatory in this instance to conclude that the University Officials failed to act with deliberate indifference, as a matter of law.

"good faith but ineffective responses" by state actors tend to defeat claims of deliberate indifference). In reaching this conclusion, the Court in no way condones the reactive risk management policy of the University Officials or their cultural bias against departing from tradition in favor of newer safer measures. Rather, the Court recognizes the distinction between state law torts and constitutional wrongs. Expanding the substantive due process clause to encompass the allegations at issue here would violate well-settled principles of constitutional law and expand the protections of the Fourteenth Amendment beyond their appointed boundaries. Therefore, because Plaintiffs fail to allege, and cannot allege, a cognizable substantive due process violation, as a matter of law, Plaintiffs' § 1983 claims against the University Officials warrant dismissal pursuant to Fed. R.Civ.P. 12(b)(6). Defendants' Motion for Summary Judgment is therefore **GRANTED** with respect to Plaintiffs' federal law claims against the University Officials and each and all of such claims are hereby **DISMISSED WITH PREJUDICE.**

## IV.

Having dismissed all of Plaintiffs' federal law claims, the Court is now faced with six negligence lawsuits governed purely by state tort law. Thus, the Court must decide whether to retain supplemental jurisdiction over Plaintiffs' remaining claims. In evaluating this matter, the Court is guided by the supplemental jurisdiction statute, 28 U.S.C. § 1367. Section (a) of that statute provides that "in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to the claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a). Section (c) of the statute refines the supplemental jurisdiction doctrine by enumerating four circumstances in which District Courts have discretion to decline supplemental jurisdiction over state law claims: (1) when the state law claims raise novel or complex issues of state law; (2) when the state law claims substantially predominate over the claims within the district court's original jurisdiction; (3) when the district court dismisses the claims over which it has original jurisdiction; and (4) in exceptional circumstances, if there are other compelling reasons for declining jurisdiction. 28 U.S.C. § 1367(c). In this case, the third factor enumerated in § 1367(c) is clearly present, and to only a slightly lesser extent, the second and fourth factors as well. The Court has dismissed all of the claims that were within the Court's original jurisdiction and only Plaintiffs' state law claims remain. And those claims are manifestly better suited for resolution by a state court, applying squarely applicable state law, in front of a jury of state citizens. Accordingly, the Court respectfully declines to exercise its supplemental jurisdiction over Plaintiffs' state law claims. *See Noble v. White,* 996 F.2d 797, 799 (5th Cir.1993) ("District courts enjoy wide discretion in determining whether to retain supplemental jurisdiction over a state law claim once all federal claims are dismissed"); *Rhyne v. Henderson,* 973 F.2d 386, 395 (5th Cir.1992) ("The district court has properly dismissed all of the federal questions that gave it original jurisdiction in this case. Therefore, we find that the district court's dismissal of the state law claims was proper under 28 U.S.C. § 1367(c)"); *see also United Mine Workers of Am. v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966) ("Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading

of the applicable law."). As such, Plaintiffs' state law claims are hereby **DISMISSED WITHOUT PREJUDICE.** Plaintiffs are free to re-file their state law claims against Defendants in state court, if they so desire, either by filing new actions or by seeking leave to intervene in the state cases that are already well underway. In doing so, Plaintiffs are of course subject to the applicable limitations requirements.[12] All Parties are to bear their own taxable costs, expenses and attorneys' fees incurred herein to date; and all other pending Motions, filed by any of the Parties to this litigation, are hereby **DENIED** as moot.

**IT IS SO ORDERED.**

12. For the same reasons, the Court also declines to exercise supplemental jurisdiction over the *Self* and *Comstock* Plaintiffs' state law claims against the non-state actor Defendants. Thus, those claims are likewise **DISMISSED WITHOUT PREJUDICE,** rather to proceed in either new or extant state court litigation, as appropriate.